Submitted on record and briefs September 11, 1995, reversed April 17, 1996

In the Matter of Mavis Headings,
Alleged to be a Mentally Ill Person.

STATE OF OREGON,
*Respondent,*

*v.*

MAVIS HEADINGS,
*Appellant.*

(9412-98009; CA A86774)

914 P2d 1129

Paul L. Breed filed the brief for appellant.

Theodore R. Kulongoski, Attorney General, Virginia L. Linder, Solicitor General, and Stephen L. Madkour, Assistant Attorney General, filed the brief for respondent.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

ARMSTRONG, J.

## ARMSTRONG, J.

Appellant appeals an order finding her to be a mentally ill person and committing her to the Mental Health Division for treatment. The order was based on a finding that appellant suffers from a mental disorder and is unable to provide for her basic personal needs. *See* ORS 426.005(1)(d)(B).[1] The trial court also found that appellant was unwilling, unable or unlikely to participate in treatment on a voluntary basis. It therefore denied her a conditional release. *See* ORS 426.130(1).[2] Appellant contends that none of the findings is supported by clear and convincing evidence, as required by ORS 426.130. We review *de novo*, *State v. O'Neill*, 274 Or 59, 61, 545 P2d 97 (1976), and reverse.

We first review the finding that appellant is unable to provide for her basic needs and is not receiving such care as is necessary for her health or safety. *See* ORS 425.005-(1)(d)(B). The court did not specify the evidence on which it based that finding. On this record, evidence that would tend to support the finding is evidence about appellant's housing, her ability to obtain food and her receipt of medical care.[3] We summarize that evidence.

---

[1] ORS 426.005 provides, in part:

"(1) As used in ORS 426.005 to 426.390, unless the context requires otherwise:

"* * * * *

"(d) 'Mentally ill person' means a person who, because of a mental disorder, is one or more of the following:

"(A) Dangerous to self or others.

"(B) Unable to provide for basic personal needs and is not receiving such care as is necessary for health or safety."

[2] ORS 426.130(1) provides, in part:

"If, in the opinion of the court, the person is:

"* * * * *

"(b) Mentally ill based upon clear and convincing evidence, the court:

"(A) Shall order the release of the individual and dismiss the case if:

"(i) The mentally ill person is willing and able to participate in treatment on a voluntary basis; and

"(ii) The court finds that the person will probably do so."

[3] Appellant's mother testified that appellant kept her house neat and dressed appropriately. Appellant's daughter testified that appellant took care of her personal hygiene and had normal sleep patterns.

Appellant's family took her to Oregon Health Sciences University hospital. Doctors at the hospital proceeded to file a notification of mental illness, initiating the commitment process. *See* ORS 426.070. A commitment hearing was held six days later. Appellant, her mother, her daughter and her brother testified at the hearing.

Appellant lives in a house with her daughter and infant granddaughter. Appellant's mother has paid appellant's mortgage payments of $224 per month over the past five years, but she is unwilling to continue to do so. Appellant had a job until approximately six months before the hearing.

Appellant cooks meals for herself because she and her daughter like to eat at different times. Appellant typically eats rice with vegetables.[4] Her weight has not fluctuated. Appellant's daughter receives food stamps and uses them to buy food for the household. The daughter does most of the shopping because appellant does not like to use the daughter's food stamps. The daughter told appellant, "I don't mind buying your groceries at all," and testified that she wanted to help out as much as she could because she was living in appellant's house without paying rent. Appellant's daughter has lived with appellant all of her life except for the period between November 1993 and June 1994. Although appellant's daughter does most of the grocery shopping, appellant sometimes walks to the grocery store to buy groceries herself.

Appellant's daughter has urged appellant to apply for her own food stamps, but appellant has resisted that suggestion. Appellant testified that "there's not a lot of money * * * so I was not eating high on the hog * * * so to speak, * * * I was not frivolous in my food choice[s]." Appellant has received public assistance in the past, including food stamps, but was not receiving public assistance at the time of the hearing. She applied for food stamps in June 1994, but was turned down because of her daughter's income. The daughter testified that, since the birth of her own daughter, she no

---

[4] Appellant's daughter testified: "It wasn't necessarily small amounts. She eats * * * rice with green beans or rice with asparagus or rice with tomatoes."

longer had an income. Consequently, she believed that appellant would qualify for food stamps if she were to apply again.

Appellant has received mental health treatment at Northeast Mental Health, and more recently at Kaiser Permanente. She testified that she had been taking Trilafon but had stopped doing so, on the advice of her doctor, approximately two months before the hearing. She also testified that she did not have a good rapport with her doctor at Kaiser. Despite that, appellant testified several times that she was willing to take medication and to participate in treatment:

"A.   If I had to take medication, I would be very comfortable taking the Trilafon dosages that I was taking.

"* * * * *

"Q.   Are you willing to go back to Northeast Mental Health —

"A.   Yes.

"Q.   — at this point? Okay. And work with the doctor there?

"A.   Right.

"* * * * *

"Q.   You'd be willing to go back to the — to the mental health clinic, and — and take some medication, and you have some confidence in the mental health clinic there?

"A.   Yes.

"Q.   Uh-huh. And —

"A.   They have a good therapist if that's what you'd like to call her.

"Q.   Uh-huh. And you'd be willing to take the medication and so forth.

"A.   Uh-huh."

Appellant was questioned by examiners Sheets and McWhirter. Both found her to be unable to provide for her basic needs. The findings of both examiners appear to be based on their concern that appellant did not have an adequate plan for how she would care for herself if she were released. Sheets noted that appellant's daughter testified

that appellant was unwilling to use the daughter's food stamps and concluded that appellant was unable to plan for a way to get food for herself when appellant's daughter did not get food stamps. Sheets also stated that appellant was unable to give an adequate explanation of why she stopped taking Trilafon. McWhirter stated that appellant had no means of support and no plans for the future.

A finding that a person is unable to provide for her basic needs must be supported "by clear and convincing evidence that the individual, due to some mental disorder, is unable to obtain some commodity (*e.g.*, food and water) or service (*e.g.*, life-saving medical care) without which [she] cannot sustain life." *State v. Bunting*, 112 Or App 143, 145, 826 P2d 1060 (1992). A person's ability to care for herself is assessed in the light of existing, as opposed to future or potential, conditions. *See State v. Stanley*, 117 Or App 327, 330, 843 P2d 1018 (1992). In *Bunting*, we explained how imminent the threat to life must be: the evidence must clearly and convincingly demonstrate that "there is a likelihood that the person probably would not survive in the near future because the person is unable to provide for basic personal needs and is not receiving care necessary for health or safety." 112 Or App at 146.

With regard to shelter, appellant's mother testified that she no longer is willing to pay appellant's mortgage payments of $224 per month. While it will require effort by appellant to keep her house without that support, at the time of the hearing she had a home. Furthermore, she understood that she would be required to pay her mortgage in the future, and she testified that she had previously held a job and planned to earn money either by getting a job or by using her home to produce income. The evidence about appellant's housing does not clearly and convincingly indicate that appellant is unable to provide for her basic needs. *See State v. Arnston*, 47 Or App 477, 480-81, 614 P2d 1214 (1980) (former in-laws' unwillingness to continue to provide individual with housing was insufficient to show that she was unable to provide for her basic needs).

With regard to food, Sheets concluded that "when daughter did not get food stamps[, appellant] was unable to

plan for a way to get food for herself." That conclusion appears to be based on the daughter's testimony describing appellant's reaction when, because of a mistake, the daughter did not get food stamps for one month:

"Q. Okay. At that time when you did not have any food stamps coming in, what was your mother's response? What — what was her plan for dealing with that problem?

"A. She said I needed to go talk to the state about it.

"Q. Did she say anything about what she could do or what she needed to do to take care of the food problem?

"A. Not that I remember, no."

All that that testimony establishes is that appellant relied on her daughter to deal with the loss of the daughter's food stamps. The daughter apparently did so, because there is no suggestion that the loss continued beyond one month. Furthermore, there is no evidence that appellant was not receiving adequate food at the time of the hearing, nor, for that matter, is there evidence that appellant did not receive adequate food during the month that her daughter failed to receive food stamps.

Appellant's hesitancy to reapply for food stamps for herself does not clearly and convincingly support a finding that she is unable to obtain food, particularly when her daughter continues to receive food stamps and to use them to purchase food for the household, including for appellant. Appellant testified that she "was not frivolous in [her] food choice[s]" because of her limited resources, but both appellant's daughter and mother testified that appellant ate adequate amounts of food. The evidence about appellant's ability to obtain food for herself does not clearly and convincingly support a finding that appellant is unable to provide for her basic needs. *See Bunting*, 112 Or App at 146.

■■ Medical care is a basic need if the failure to obtain that care likely would cause the person to die in the near future. *See State v. Brungard*, 101 Or App 67, 71, 789 P2d 683, *adhered to as modified* 102 Or App 509, 794 P2d 1257 (1990), *rev den* 311 Or 427 (1991); *Bunting*, 112 Or App at 145-46 (explaining *Brungard*). There is no evidence in the record that appellant was failing to obtain necessary medical

care. Appellant's testimony that she stopped taking Trilafon on the advice of her doctor is uncontroverted. Furthermore, appellant testified several times that she was willing to obtain medical care from Northeast Mental Health. The evidence regarding appellant's medical care is insufficient to support a finding that appellant is unable to provide for her basic needs. *See Brungard,* 101 Or App at 71 (individual's failure to take lithium did not constitute inability to meet basic needs).

Because we conclude that there is insufficient evidence to find that appellant is unable to provide for her basic needs, we need not reach appellant's other two assignments of error.

Reversed.