Submitted on record and briefs May 5, 2000, affirmed May 9, petition for review denied July 17, 2001 (332 Or 316)

In the Matter of Maryann Jayne,
Alleged to be a Mentally Ill Person.

STATE OF OREGON,
*Respondent,*

*v.*

MARYANN JAYNE,
*Appellant.*

9812-71261; A104696

23 P3d 990

Theresa M. Kohlhoff filed the briefs for appellant.

Hardy Myers, Attorney General, Michael D. Reynolds, Solicitor General, and Lainie F. Block, Assistant Attorney General, filed the brief for respondent.

Before Edmonds, Presiding Judge, and Deits, Chief Judge, and Armstrong, Judge.

EDMONDS, P. J.

Armstrong, J., dissenting.

## EDMONDS, P. J.

Appellant appeals from an involuntary mental commitment order. ORS 426.130. She makes two assignments of error. On *de novo* review, we affirm.

■■ In her first assignment of error, appellant argues that, contrary to ORS 426.095(4)(d)(C),[1] the investigation report prepared by the precommitment investigator was admitted without the investigator being present during the hearing to be cross-examined and without appellant's waiver of the investigator's presence at the hearing. Appellant concedes that she made no express objection on that ground to the trial court. Nevertheless, she urges that we review her assignment of error on the basis that it is error apparent on the record. Our review of a claim of error apparent on the face of the record is discretionary. In *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 381-82, 823 P2d 956 (1991), the court said, regarding unpreserved error and when it is reviewable on the face of the record, that

> "[T]he error must be one 'of law'; that it must be 'apparent,' *i.e.*, the point must be obvious, not reasonably in dispute; and that it must appear 'on the face of the record,' *i.e.*, review in court must not need to go outside the record to identify the error or choose between competing inferences, and the facts constituting the error must be irrefutable." (Citations omitted.)

Here, when the state offered the investigator's report, the court inquired of appellant's counsel:

Court:   "Any objection?"

Appellant's Counsel:   "Minus hearsay, no objection."

ORS 426.095(4)(d)(C) expressly authorizes the waiver of the presence of the investigator by the counsel of the allegedly

---

[1] ORS 426.095(4)(d)(C) provides:

"Neither the investigation report nor any part thereof shall be introduced into evidence under this paragraph unless the investigator is present during the proceeding to be cross-examined or unless the presence of the investigator is waived by the alleged mentally ill person or counsel for the allegedly mentally ill person."

mentally ill person. It is reasonably inferable from appellant's counsel's statement that appellant desired to waive the presence of the investigator when counsel specified "hearsay" as the only objection.[2] In light of the competing inferences that arise from counsel's statement to the court, whether the statute was violated is also in dispute. Therefore, we decline to exercise our discretion to review the claim of error as error apparent on the face of the record.

■ ■    In her second assignment of error, appellant challenges the sufficiency of the evidence that resulted in her commitment. ORS 426.130(1) provides, in relevant part:

> "After hearing all of the evidence, and reviewing the findings of the examining persons, the court shall determine whether the person is mentally ill. If, in the opinion of the court, the person is:
>
> "(a)  Not mentally ill, the person shall be discharged forthwith.
>
> "(b)  Mentally ill based upon clear and convincing evidence, the court:
>
> "\* \* \* \* \*
>
> "(C)    May order commitment of the individual to the Mental Health and Developmental Disability Services Division for treatment if, in the opinion of the court, [dismissal for voluntary treatment or conditional release] is not in the best interest of the mentally ill person."

ORS 426.005(1)(d) provides, in relevant part:

> " 'Mentally ill person' means a person who, because of a mental disorder, is one or more of the following: (A) Dangerous to self or others. (B) Unable to provide for basic personal needs and is not receiving such care as is necessary for health and safety."

Appellant argues that the state failed to prove by clear and convincing evidence that she is unable to provide for her basic personal needs and that she is not receiving such care as necessary for her health or safety. Evidence is "clear and convincing" when the truth of the facts asserted is

---

[2] Appellant does not argue on appeal that the trial court erred when it overruled her hearsay objection.

highly probable. *State v. Evjen*, 111 Or App 368, 371, 826 P2d 92 (1992). In *State v. Bunting*, 112 Or App 143, 145, 826 P2d 1060 (1992), we explained:

> "The legislature's 'basic needs' commitment standard focuses on the capacity of the individual to survive, either through his own resources or with the help of family or friends. The state must establish by clear and convincing evidence that the individual, due to a mental disorder, is unable to obtain some commodity (*e.g.*, food and water) or service (*e.g.*, life-saving medical care) without which he cannot sustain life. The statute does not express a standard by which the imminence of the threat to life is to be measured.

> "A speculative threat, such as the failure to take medicine under the circumstances in *State v. Brungard*, [101 Or App 67, 71, 789 P2d 683, *mod* 102 Or App 509, 794 P2d 1257 (1990), *rev den* 311 Or 427 (1991)] is not itself sufficient. However, the state need not postpone action until the individual is on the brink of death. The goal of the commitment statute is safe survival, not merely the avoidance of immediate death."

That standard is met is this case. The hearing in this matter occurred in early December. Roger Jayne, appellant's husband of 37 years,[3] testified at the hearing that his wife suffers from a bipolar disorder and has a history of mental illness, including hospitalizations in 1968, 1986 and 1997. Appellant has a master's degree in education and had held many business positions in the community until she lost her employment during the previous year. Jayne testified that, when appellant is taking her medication, she lives a "normal life" and has the financial ability to provide for her necessities. When she does not take her medication, she "can not keep care of herself." In the 15 months preceding her commitment, appellant had not been taking her medication. Subsequently, there had been a chronic failure by appellant to pay her monetary obligations for necessities and to maintain personal relationships. Jayne testified that the mortgage holder of the residence in which appellant resided had telephoned him, and that "there could be a good chance, that she would

---

[3] Apparently, Jayne and appellant had separated about a year before the hearing but remained in contact with each other. A dissolution of marriage was either pending or had been adjudicated.

lose her home." Also, Jayne testified that the gas company and utility companies had been telephoning him about her failure to pay her bills and that he could no longer take care of her and pay her obligations. When Jayne was asked, "has your wife—during recent mental illness, has she displayed an inability to be organized enough to live on her own, if the house weren't there," he answered, "No, not at all." Jayne testified that appellant has called 9-1-1, the police, and the utility companies to come to her house to check for rays and fumes from the gas furnace, and in mid-December, she did "something to the furnace. There is no heat in the house right now."[4]

Jayne testified that appellant had "lost about 25 pounds in the past" year and that there is "not much to eat in the house." He explained, "I am assuming she's eating out a great deal." Jayne was uncertain about appellant's income because she was no longer working, noting that she was receiving a $97 monthly installments from her mother's estate. He summarized his concerns:

"She is very paranoid and her obsession—people in this state of mind, of course, they create obsession. And her obsession since she got off her medication has been the furnace in the house. And between the furnace giving off various fumes and rays and gases and the electricity giving off electronic rays, she's convinced that myself and my friends have arranged this in order to just create problems for her."

The state also called Carol Rae Ballard, a friend of appellant for 40 years, and a neighbor for 28 years. Ballard confirmed that appellant had lost weight over the last year. She testified:

"She—She's very paranoid. She imagines things, she tells me things and then I know she doesn't remember

---

[4] Jayne's testimony was based in part on information from his son who had visited appellant's residence within days of the hearing and had determined that the heat "will not turn on." Jayne testified that he had been in contact with appellant "at least every other day" by telephone and had been inside appellant's residence in August. He had been contacted by Portland General Electric in mid-October about appellant's call "demanding to them that they remove the electronic rays and laser beams that the electricity was just putting out." The electricity was still on at the house within a day or two of the hearing. Apparently, Jayne had been paying appellant's utility bills at times to continue service to her residence, but he testified that he no longer had the finances to bail out appellant.

because, when I approach her about them or mention them later, she says that she never did that. So she definitely does not remember all the things that she tells me. I haven't done it lately, but I used to have to go over in the morning and wait while she came out of the house because she was afraid of the people that were hiding in the house. And we'd have to check and make sure there was no one in the house or her car, her car trunk, et cetera."

Ballard also testified that appellant has "little booby traps set in the hall like a mop and a bucket to kind of [deter] whoever is in there so that [they] can't get through." When asked whether appellant is able to care for herself on her own, Ballard testified, "I don't think she is, I am worried that someone is going to take advantage of her because of her mental state."

Appellant is described by the precommitment investigator as "delusional with paranoid ideation," "grandiose," "expansive," and "agitated." "She distrusts virtually everyone," believing she is "being poisoned, spied on and impersonated[.]" Appellant was also examined by two mental examiners at the hearing. Her responses to them were disjointed and generally drifted off to other subjects without being responsive. Appellant denied that she suffers from any mental illness, despite her significant history of hospitalizations and her delusional state. She refused to take any medication while hospitalized and awaiting the hearing. Both examiners commented on the severity of her delusional thinking patterns and concluded that those patterns impede her from accepting mental health assistance. After observing appellant's behavior and her statements during the hearing and listening to the lay witnesses, both examiners concluded that appellant was unable to provide for her basic needs because of her mental illness. One examiner described her mental state as a "very severe deterioration from [a] highly functional state * * * to the degree of inability to cope."

After hearing the evidence and taking into account the examiners' opinions, the court said:

"The Court finds that the mental examiners really seem to have the best perspective on this and their findings are incorporated in my findings at this time. That is, that Ms. Jayne appears to be deteriorating at a rapid rate, that she

has delusions which are ongoing. There's a history of this but, certainly, now there is a daily, what we'd call a baseline, I suppose, that is not improving just with a mere hospital stay; in other words, with being removed from a stressful environment. And the sad aspect of this is that there's no question that just being out in the community is terribly stressful for Ms. Jayne at this time. In fact, being in her home is stressful."

Regarding the state's burden of persuasion, the court observed

"Now, that's not enough when we're talking about clear and convincing evidence, because the case law tells us all—the judges, particularly—very clearly that just eccentricity is not enough. Just being an eccentric person is not enough for a civil commitment to go through. But when that eccentricity reaches a level of a person being unable to care for herself in this situation, then the Court steps in and has to deal with the situation.

"* * * * *

"* * * Ms. Jayne has been unable to really attend to her finances. That's absolutely clear, and it's absolutely clear to the Court that unless there is some intervention that Ms. Jayne will lose her house and will be placed out on the street where she will be unable to survive.

"She is not able at this stage to really avail herself of the sort of resources that she needs to get through the winter * * *.

"What I've been presented in terms of clear and convincing evidence today is the fact that Ms. Jayne, at least as of April when Mr. Jayne moved out, has deteriorated in a very clear sort of fashion, that she's had weight loss which seems to be consistent with an inability to eat or to take care of her basic needs for food, that her basic presentation on the streets and on a daily basis is one of someone who is disheveled and unable to care for her clothing, that the delusional activity in the pursuit of a job—and that's where I feel so sad about the situation, because Ms. Jayne knows she needs to get a job, she knows she needs to work and that it would be appropriate to work, and yet her delusions interfere with that. And there's no question that Ms. Jayne is going to be unable to get a job, just cannot get a job without

the help of medication. This is medication that she refuses to take. There is no question that it's what's needed.

"Today's testimony has also made it clear to the Court that Ms. Jayne is unable to function in a proper manner to care for her own needs. she's unable, frankly, to answer the questions which have been asked by the examiners, and she's writing feverishly in a manner that, well, troubles the court but that appears to reach no rational end. It's all a terribly sad situation * * *."

Although our review is *de novo* on the record, the trial court's ability to observe appellant's affect, responses and reactions in the commitment hearing are important considerations. In all, the evidence paints the picture of a person who, as shown by her delusional state, has a severe mental illness. A consequence of her illness is that she is not able to manage her finances in a way that will provide her with housing, or even heat in her house in the middle of winter. Her weight loss of 25 pounds over a period of a year suggests that she is not eating properly. There is nothing speculative about the effects of her failure to take her medication. They have already been manifested as appellant continues to progressively deteriorate.

■ Case matching is not particularly helpful in these kinds of cases; each case must be decided on its own facts. Even so, this case is not a case like *Brungard* in which we held that the appellant's failure to take lithium coupled with irregular sleeping and eating had not been shown to be immediately threatening. Rather, this case is more like the circumstances in *Bunting* where the appellant's disorganized thinking and refusal to take medications, in the opinion of his physicians, rendered him presently unable to provide for his basic needs. Apparently, the dissent believes that the law requires that a person be at the brink of death before the person is subject to involuntary commitment. As we have said previously, the statute does not impose that stringent a standard. The law does not require that appellant become homeless or in danger of starvation before a court is authorized to act in her best interests. On the record before us, we find by clear and convincing evidence that appellant's mental illness

prevents her from providing the basic needs of food and shelter for herself. Consequently, the trial court did not err when it committed her to the Mental Health Division.

Affirmed.

**ARMSTRONG, J.,** dissenting.

I dissent from the majority's conclusion that appellant is unable to meet her basic needs under the applicable statutory test and therefore that she was properly committed by the trial court. ORS 426.005(1)(d); ORS 426.130(1)(b)(C). Because I would conclude that the state has not met its rigorous burden of proving by clear and convincing evidence that appellant will likely die in the near future if not committed, I respectfully dissent.

Our previous decisions indicate that the test for establishing mental illness under ORS 426.005 and thereafter committing a person to state custody under ORS 426.130 is an extremely stringent one. We have stated that a

> "finding that a person is unable to provide for her basic needs must be supported 'by clear and convincing evidence that the individual, due to some mental disorder, is unable to obtain some commodity (*e.g.*, food and water) or service (*e.g.*, life-saving medical care) without which [she] cannot sustain life.' *State v. Bunting*, 112 Or App 143, 145, 826 P2d 1060 (1992). A person's ability to care for herself is assessed in the light of existing, as opposed to future or potential, conditions. *See State v. Stanley*, 117 Or App 327, 330, 843 P2d 1018 (1992). In *Bunting*, we explained how imminent the threat to life must be: *the evidence must clearly and convincingly demonstrate that 'there is a likelihood that the person probably would not survive in the near future* because the person is unable to provide for basic personal needs and is not receiving care necessary for health or safety.' 112 Or App at 146."[1]

---

[1] The majority apparently takes issue with this test. *See* 174 Or App at 82. It contends that a person need not be on the brink of death before the state may involuntarily commit her. Although it is true that an appellant need not literally be about to die, our cases emphasize that an appellant must face a likelihood of death in the *near future* and that that likelihood must be established with high probability before the state can deprive her of her liberty. The majority errs by lowering the standard for this case.

*State v. Headings*, 140 Or App 421, 426, 914 P2d 1129 (1996) (emphasis added). Moreover, to satisfy the clear and convincing standard,[2] the state's evidence must be of "extraordinary persuasiveness," *State v. DeMartino*, 164 Or App 331, 335, 991 P2d 1093 (1999) (citations and internal quotation marks omitted), and it must establish that the truth of the facts asserted is "highly probable," *State v. Nance*, 85 Or App 143, 146, 735 P2d 1271 (1987).

In order to conclude that the state has made the required showing in this case, the majority dispenses with our prior emphasis on whether an appellant will survive in the near future and draws unwarranted conclusions from meager evidence. The evidence on which the majority relies does not meet the clear and convincing standard.

First of all, I note that the evidence in the record does not establish, with high probability, that appellant's bipolar disorder is a life-threatening condition. Unmedicated, appellant unquestionably has difficulty functioning and is not easy to get along with. Nonetheless, the record is devoid of evidence suggesting that her difficulties are of such magnitude that they will shortly bring her to the brink of death. Moreover, no expert testified that impending death was the likely result of untreated bipolar disorder.

The majority ignores the fact that we previously held that another appellant's unmedicated bipolar disorder was not life-threatening *in spite of the fact that that appellant had previously attempted suicide while unmedicated. State v. Brungard*, 101 Or App 67, 71, 789 P2d 683, *on recons* 102 Or App 509, 794 P2d 1257 (1990), *rev den* 311 Or 427 (1991) ("[O]n this record, defendant's failure to take lithium is not shown to be *immediately* threatening, even when coupled with irregular sleeping and eating.") (emphasis in original; citation omitted).[3] Here, appellant has no history of suicide

---

[2] In *Riley Hill General Contractor v. Tandy Corp.*, 303 Or 390, 397, 737 P2d 595 (1987), the Supreme Court traced the history of the clear and convincing evidentiary standard and explained that " 'clear' describes the character of unambiguous evidence, whether true or false; 'convincing' describes the effect of evidence on an observer."

[3] The majority attempts to distinguish *Brungard* without explaining its basis for doing so. 174 Or App at 82. Clearly the most relevant distinction between this

attempts or other life-threatening activities when unmedicated. There simply is no basis to conclude that it is highly probable that appellant will die in the near future from her untreated bipolar disorder.

I now shift my focus to the specific problems that appellant's failure to take medication has caused. As the majority notes, appellant disabled her furnace as a result of her delusion that noxious substances were emanating from it. Although appellant's decision to disable her furnace could potentially be harmful, for instance if appellant did not reconnect it during severe winter weather, appellant testified at the hearing that she was able to turn the power for the furnace off and on and that she turned it off only when she left the house. No one (besides appellant) who testified at the hearing had examined the furnace and could explain what state it was in. On the record before us, I would not hold that appellant's decision to disable her furnace helps the state establish, with high probability, that appellant is unable to meet her basic needs.

Moreover, although I recognize that appellant's financial situation is problematic, the evidence in that regard is simply too unspecific and too inconclusive to permit a conclusion, based on clear and convincing evidence, that appellant is unable to meet her basis needs. Although the evidence indicates that appellant receives $97 a month from her mother's estate, no one at the hearing knew whether her other resources, such as the 401K account that she had apparently cashed in and her severance package, were exhausted. Moreover, no direct testimony was elicited from appellant on the issue. When asked about his wife's finances, appellant's husband stated that "quite frankly—and I'm not being facetious—I think they're better than my own." When asked whether his wife was in danger of losing her home, appellant's husband responded that "[i]t honestly depends on

---

case and *Brungard* is that the appellant in *Brungard*, who suffered from the same disorder as appellant, had engaged in life-threatening behavior in the past as a result of his failure to take medication, while appellant in this case has not. Thus, in that respect, there is less evidence in this case than there was in *Brungard* tending to indicate that the failure to take medication could potentially be dangerous. Nonetheless, we held in *Brungard* that the appellant should not have been committed based on his alleged inability to meet his basic needs. *Brungard*, 101 Or App at 71.

what her resources are." It is simply impossible reasonably to conclude, based on the above evidence, that appellant's finances have dipped so low that she is unable to meet her basic needs for shelter and food. The majority errs in using that very inconclusive evidence as the cornerstone of its holding. As we have repeatedly stated, speculative threats to an individual's well being cannot justify a deprivation of liberty as grave as involuntary mental commitment.[4]

Finally, I turn to the evidence on appellant's eating habits. Appellant's husband testified that there was little food in the house but that appellant claimed to eat at restaurants rather than at home. No evidence controverted appellant's statement to husband that she eats at restaurants. Moreover, although appellant's loss of 25 pounds over the course of a year could conceivably be dangerous if certain other facts were also established, the evidence of appellant's weight loss, standing alone, cannot bear the weight that the majority places on it. Without some specific indication of what appellant weighed before she lost the weight and whether she is currently underweight for her height and bone structure, the evidence of appellant's weight loss is a *non sequitur*. In fact, it could well be healthier for her to have lost the weight than to have stayed at her previous weight. We simply cannot tell from the record before us, much less conclude with high probability that appellant is unable to meet her basic need for food. *Cf. Nance*, 85 Or App at 146 (concluding that evidence that the appellant had fallen significantly below her ideal weight at one point during the prior six weeks did not establish that she was unable to meet her basic needs).

Because I would conclude that appellant's failure to take her medication and the troubling behavior that ensues from that decision are not sufficiently dangerous to allow us to determine, with high probability, that appellant would face a likelihood of death in the near future, I would reverse

---

[4] *See State v. Ayala*, 164 Or App 399, 402, 991 P2d 1100 (1999) (the threat must be actual rather than speculative). *See also DeMartino*, 164 Or App at 337 ("appellant's inability or unwillingness to make mortgage payments on a home does not indicate a probability that her survival was in question"); *Headings*, 140 Or App at 426 (the risk of losing one's house at some point in the future is not sufficient to justify commitment).

the order of the trial court committing appellant to the custody of the Mental Health and Developmental Services Division. ORS 426.005(1)(d)(B); ORS 426.130(1)(b)(C). Accordingly, I respectfully dissent.