Argued and submitted January 30, reversed August 29, 2001

In the Matter of Cori Aron,
Alleged to be a Mentally Ill Person.

STATE OF OREGON,
*Respondent,*

*v.*

CORI ARON,
*Appellant.*

0003-63064; A109914

31 P3d 475

Thomas K. Coan argued the cause and filed the brief for appellant.

David F. Coursen, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Edmonds, Presiding Judge, and Armstrong and Kistler, Judges.

KISTLER, J.

## KISTLER, J.

Appellant challenges an order finding her to be mentally ill because she cannot provide for her basic needs. We reverse.

Appellant is a 32-year-old single mother whose son was 20 months old at the time of the hearing. She holds a masters degree in social work but is not presently employed in that field. She receives some income for providing astrology readings. Her father supplies her with additional money, pays the rent on her apartment, and provides her with health insurance.

Before the incident that gave rise to this proceeding, appellant had no history of mental illness.[1] On March 2, 2000, appellant called a neighbor, Michael Griffin, and asked him to help care for her child because she was not feeling well. On arriving at appellant's apartment, Griffin was concerned that appellant was thin and undernourished and insisted that she go to the hospital. He testified that "[s]he was as small as I've ever seen her, as thin and undernourished looking as I've ever seen her. She had a blotchy face, she had burgundy blotches on her face." Griffin and appellant went to the emergency room. Appellant was given intravenous fluid treatment (IV) and told that she suffered from a viral infection and dehydration. Griffin testified that, after treatment, appellant "looked much better. The blotches had disappeared[.]"

Griffin saw appellant the next day when he came over to go to the grocery store for her. Appellant appeared panicky, was unable to write out a grocery list, and paced around the house. Griffin went to the grocery store. When he returned, appellant appeared more anxious. At appellant's request, they went back to the emergency room. The doctor wanted to prescribe Xanax, but appellant did not think she was experiencing panic attacks.

---

[1] Appellant's neighbor testified, however, that, when he told one of appellant's out-of-state friends how appellant was behaving, the friend responded that "[s]he had witnessed other episodes, nothing ever as serious a[s] this one."

After they returned home, appellant called Griffin again, explaining that she was "telepathic and that her brain was going so fast and she couldn't keep up with it." Appellant now believed she should get the prescription for Xanax. Griffin went with her to the hospital and then to the pharmacy. Griffin brought appellant back home, but shortly after he left her there, appellant called him once again. She wanted him to take her child for the evening because "[s]he was having more problems with her brain" and "believed she was dying." When Griffin arrived, appellant was talking on the phone with another friend, recounting her belief that "a program was put in her" by aliens, and "that this was part of the program, and that she was going to die."

On March 6, one of appellant's friends called Griffin. She said that appellant would not answer the door or the phone and that they should call the police. Griffin did so. The officer arrived, spoke to appellant, and left shortly afterwards. Later that night, at about 3:30 a.m., appellant called Griffin and left a message on his answering machine. She said:

> "Hey, you guys, come over right away, because I'm dying and I'm going to be dead, and someone needs to get [my child]. The door's open. Send the police, break the door down, whatever you need to do, but you need to get him. And call my dad or [a friend], and have one of them take him. Okay? I'm serious. Bye."

The message woke Griffin up; he called the police and waited for them outside appellant's home.

Officer Cheryl Waddell arrived and spoke with appellant. Waddell testified that appellant told her "that her head didn't hurt anymore, that she was okay. She thought that it was going to explode, but it was all right now." Waddell thought that appellant should go to the hospital and attempted to get her and the child ready to leave the house. Appellant walked around the house for "probably 30, 40 minutes, just wandering around, stalling." It was approximately 33 degrees outside, but appellant only put a thin blanket on her son and then did not cover his legs with it. She also held her son over her head for "roughly five minutes" in a "way to where it looked like she could drop him." The officer

convinced appellant to leave her son with Griffin and then took her to the hospital.

Appellant was examined by a physician and placed on an emergency psychiatric hold pursuant to ORS 426.232. While she was in the hospital, the State Office for Service to Children and Families (SCF) took custody of her son. Appellant remained in the hospital until the commitment hearing on March 14, 2000, but refused antipsychotic medication while she was in the hospital.

When she testified at the hearing, appellant appeared coherent and oriented. One of the examiners noted that she "shows no evidence of a psychiatric disorder today, but credible witnesses report [earlier] behavior indicative of one." Based on the witnesses' description of appellant's earlier behavior, the examiner concluded that she suffered from a mental disorder. He determined, however, that she was not a danger to herself or others and that she was able to provide for her basic needs. He accordingly recommended that she not be committed. The other examiner agreed that appellant suffered from a mental disorder. He also agreed that she was not a danger to herself and was able to provide for her basic needs. He concluded initially that she was a danger to others—namely her child—and recommended commitment. However, when the trial court explained that SCF had removed the child, the examiner's concern was obviated and he changed his opinion that she should be committed.

The trial court reached a different conclusion. It agreed that appellant suffered from a mental disorder. It found, however, that she was "[u]nable to provide for basic personal needs and is not receiving such care as is necessary for health or safety." ORS 426.005(1)(d)(B). Specifically, the court reasoned:

> "[Appellant] has not been caring for herself, particularly in the area of nutrition. She has been in a decline. It is a physical decline, as well as a mental decline.
>
> "I do not accept that it is reasonable that her trips to the hospital and the IV have been consistent simply with a viral disorder, but with the fact that she is not taking nutrition, that she's not taking in enough liquid, that she's not eating, and that she continues not to eat.

> "She is unable to accept care, and with this refusal the Court is of the opinion that in this case there is clear and convincing evidence that a release would result in her being an immediate threat to herself.

> "She only weighs 98 pounds, she's not taking [in] nutrition. She has had some nutrition in the hospital. That's clear. She is better off as a result of her hospital stay, but the Court is satisfied that if returned to her own devices that it's only reasonable to believe that she will return to her ways of not eating, not properly taking in food or fluids."

Based upon that finding, the trial court found appellant to be a mentally ill person[2] and ordered her committed to the custody of the Mental Health Division for not more than 180 days.

On appeal, appellant does not dispute that she suffers from a mental disorder. Rather, she argues that the court erred in finding that, at the time of the hearing, she was unable to provide for her basic needs. In *State v. Bunting*, 112 Or App 143, 146, 826 P2d 1060 (1992), we explained:

> "A person is subject to a 'basic needs' commitment under ORS 426.005(2)(b)[3] if clear and convincing evidence demonstrates that, due to a mental disorder, there is a likelihood that the person probably would not survive in the near future because the person is unable to provide for basic personal needs and is not receiving care necessary for health or safety."

Although appellant suffers from a mental disorder, the state has not established by clear and convincing evidence that she cannot provide for her basic needs. Appellant has food to eat, a place to stay, and health insurance. *See State v. Headings*, 140 Or App 421, 423, 914 P2d 1129 (1996). She has friends and family who support her; the evidence showed that appellant repeatedly requested and continuously received help

---

[2] ORS 426.005(1)(d) provides:

" 'Mentally ill person' means a person who, because of a mental disorder, is one or more of the following:

"(A) Dangerous to self or others.

"(B) Unable to provide for basic personal needs and is not receiving such care as is necessary for health or safety."

[3] *Former* ORS 426.005(2)(b) is identical to ORS 426.005(1)(d)(B).

from her family and friends. *See State v. Johnson*, 131 Or App 561, 567-68, 886 P2d 42 (1994).

The trial court reached a different conclusion because it apparently inferred from her weight loss that she would not eat or take liquids if left on her own. That inference is not supported by any direct evidence in the record[4] and is contrary to appellant's repeated requests for medical help when she became ill. The trial court's inference is also at odds with the opinions of both examiners, who concluded that appellant was capable of providing for her basic needs. Finally, we note that appellant's disorder appears episodic. According to one examiner, she showed "no evidence of a psychiatric disorder" at the hearing even though she had not taken any antipsychotic medication in the hospital. It may be that her mental disorder will manifest itself in the future, but there is no evidence in the record from which we can determine, with any assurance, either the likelihood or the severity of any future episodic problems that appellant may experience. In short, the state has not established by clear and convincing evidence that appellant cannot provide for her basic needs. *See State v. Sea*, 137 Or App 333, 337, 904 P2d 182 (1995); *State v. Fletcher*, 60 Or App 623, 628, 654 P2d 1121 (1982) (distinguishing between "a mental disorder in the clinical sense and a mental disorder that requires commitment").[5] We accordingly reverse the trial court's order committing appellant to the custody of the Mental Health Division.

Reversed.

---

[4] The only evidence of appellant's eating habits is Griffin's testimony that the day after appellant's second trip to the hospital she ate some eggs, but "fed more to the child than she ate herself." When asked about her eating habits, appellant responded that she eats regularly and that her "cabinets are pretty full of food." *Cf. State v. Brungard*, 101 Or App 67, 70, 789 P2d 683, *modified on other grounds on recons* 102 Or App 509, 794 P2d 1257 (1990), *rev den* 311 Or 427 (1991) ("The record does not disclose how * * * inadequate [her] nutrition might have been. * * * Without more, the evidence of [her] eating * * * habits is insufficient to prove that [she] is unable to meet [her] basic needs.").

[5] The state also argues that appellant is a mentally ill person because she is a danger to her child. *See* ORS 426.005(1)(d)(A). However, the record shows that SCF had taken custody of appellant's child. Given that evidence, the trial court was not persuaded that appellant was a danger to her child. We agree with the trial court that, on this record, we cannot say that appellant is a danger to her child.