Argued and submitted April 16, affirmed December 26, 2001

In the Matter of Sharon Bolander,
Alleged to be a Mentally Ill Person.

STATE OF OREGON,
*Respondent,*

*v.*

SHARON BOLANDER,
*Appellant.*

9906-65271; A107099

37 P3d 216

Susan D. Isaacs argued the cause and filed the brief for appellant.

Ryan Kahn, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Edmonds, Presiding Judge, and Armstrong and Kistler, Judges.

KISTLER, J.

Armstrong, J., dissenting.

## KISTLER, J.

The trial court committed appellant to the custody of the Mental Health Division because it found that, as a result of a mental disorder, she was unable to provide for her basic needs.[1] On appeal, appellant argues that the record does not support the trial court's finding. We review *de novo* and affirm.

Appellant is a 36-year-old woman, who suffers from a combination of medical conditions. She is diabetic and has been instructed to follow a special diet to control that condition. She also suffers from bipolar disorder. As both examiners explained, as a result of her disorder, she displays a "[p]sychotic thought process." She is paranoid and delusional and lacks insight into her physical and mental problems.

Appellant's only source of income is Social Security. She had been a tenant at a rooming house for approximately a year before the hearing. She had, however, experienced some problems at the rooming house. The manager testified that he had received "multiple complaints" that appellant had been going through the hallways naked and "pounding on people's doors close to midnight or sometimes after midnight." Sometime before the hearing, appellant had "destroyed her room." As a result of a domestic disturbance, she had "knocked over the door of the room next door to her, and she claimed that she accidentally shattered the window because the woman who lived next door shared the same boyfriend with her."

Appellant's own room is "disheveled." Her clothes are "everywhere on the floor, and the smell is overwhelming." As the manager explained, even when appellant's door was

---

[1] ORS 426.005(1)(d) provides, in part:

" 'Mentally ill person' means a person, who, because of a mental disorder, is one or more of the following:

"(A) Dangerous to self or others.

"(B) Unable to provide for basic personal needs and is not receiving such care as is necessary for health and safety."

closed, he could smell what he described as a "very overpowering" odor of urine coming from her room. The specific incident that gave rise to this hearing occurred in late June. According to appellant, she smelled smoke as she was getting out of the bathtub. She tried to get out of her room but could not open the door.[2] She leaned out the window and began yelling "9-1-1, 9-1-1." She told the manager of the rooming house, and her neighbor confirmed, that she got out of the window and onto the roof. As the manager explained, "[s]he was on the roof undressed shouting 'fire.' " There was, however, no fire.

After that incident, the manager gave appellant a 30-day eviction notice.[3] She also was taken to a mental health facility as a result of the incident and placed on an emergency psychiatric hold, which resulted in a precommitment investigation. Appellant told the precommitment investigator that she had had a baby while she was being taken into the mental health facility. When the investigator questioned that statement, appellant explained that "she started having babies when she was 4 years old." During the course of that investigation and also during the hearing, appellant denied that she had any mental health problems, refused to discuss her medications, insisted that she was eating correctly to manage her diabetes, and refused to discuss what she would do when, in a month, she would be evicted from her apartment. The evidence showed, however, that appellant suffered from a mental disorder, that she had no plan where she would go when she was evicted, that she was not taking her medications, and that she was not aware of what she should eat to control her diabetes.

The trial court described appellant's demeanor during the hearing. It noted that she

> "is unable to focus on the salient and appropriate aspects of the conversation or respond appropriately, and she's unfortunately having outbursts here in court which involve extreme emotional shifts from laughter to crying, which she doesn't appear to be able to control but which appear to be sort of a safety valve for her."

---

[2] Appellant apparently could not release the lock on the inside of the door.

[3] Appellant previously had given notice that she was leaving.

Both examiners confirmed those observations. One examiner noted that "[s]he is tearful then happy. Paranoid, believes people are out to get her." The other observed that she was sometimes "gleeful" but that, "[w]hen talking about her meds, she sounded as if she was about to *break* into *tears*. She wouldn't talk about, discuss, her medications." (Emphasis in original.)

Both examiners concluded that appellant was a danger to herself and unable to provide for her basic needs. One explained that she has an "[i]nability to plan—exercise judgment with a degree of insight and a delusional system that keeps her from seeing things as they are[—]describe [*sic*] a continuing inability to keep out of harm's way." The other concluded:

> "Manic presentation with psychotic thought process featured by significant paranoid delusions. Impaired judgment and insight that prevent [her] from meeting basic needs. Unable to maintain physical and mental health due to untreated mental disorder."

The trial court agreed that appellant suffered from a mental disorder and was unable to meet her basic needs. It accordingly ordered that she be committed to the custody of the Mental Health Division for no more than 180 days.

■    A person is mentally ill within the meaning of ORS 426.005 if he or she is unable to meet his or her basic needs because of a mental disorder. *State v. Johnson,* 117 Or App 237, 239-40, 843 P2d 985 (1992). Basic needs include food and shelter. *Id.* In *Johnson,* the appellant had no place to stay, no plan of where she would go, and was seriously malnourished when she was not under a doctor's care. *Id.* at 240-41. We explained that her mental condition "impair[ed] her ability to recognize that shelter is a basic need." Given those facts, we found on *de novo* review that the appellant was unable to meet her basic needs. *Id.*

■    This case is similar to *Johnson.* Here, appellant was about to be evicted. There was no evidence that she had any place to go after she was evicted, nor was there any evidence that any place would accept her in her current condition. When asked what she planned to do, she refused to say

because she did not want people following her around. She explained only that, when she was evicted, she would "[g]o home, get my keys off the roof, keep packing, [and] go to the grocery store." Appellant refused to recognize that she had a mental illness and refused to discuss whether she was taking her medications. She also had no insight into what she should eat to control her diabetes. Although she testified that she had learned what she should eat, she explained that the appropriate diet for diabetes was "[a] big Hershey bar."

As both examiners explained, appellant's mental disorder keeps her from having any insight into either her needs or how they should be met. Rather, when left on her own, she has taken actions that have put her in harm's way. When she mistakenly believed that her building was on fire, she could not manage to unlock the door from the inside; she ended up instead on the roof without, among other things, any shoes on, shouting "fire." Although she did not slip and fall, she put herself in a situation that can only be described as inherently dangerous. Given her delusional mental state, her lack of any plan to obtain housing after she is evicted, and her lack of insight into what she needs to do to protect herself in an unstructured environment, we agree with the trial court that this record establishes by clear and convincing evidence that appellant is unable to meet her basic needs. *See State v. Jayne*, 174 Or App 74, 82, 23 P3d 990, *rev den* 332 Or 316 (2001); *Johnson*, 117 Or at 240-41.

Affirmed.

**ARMSTRONG, J.,** dissenting.

The majority finds that appellant is unable to provide for her basic personal needs. I respectfully disagree. In my view, the state failed to present evidence sufficient to establish that appellant is unable to obtain a commodity or service necessary for her survival. It follows, therefore, that the trial court erred in ordering appellant to be committed to the custody of the Mental Health Division.

The majority quotes the mental health examiners, who describe appellant as having a "psychotic thought process" and "paranoid delusions," and describes appellant's

erratic courtroom demeanor. It also discusses appellant's diabetes and her special diet to control that condition. The majority fails to explain, however, how that evidence meets the test for a basic needs commitment.

To commit a person for being unable to meet her basic needs, the state must establish "by clear and convincing evidence that the individual, due to a mental disorder, is unable to obtain some commodity (*e.g.*, food and water) or service (*e.g.*, life-saving medical care) without which [she] cannot sustain life." *State v. Bunting*, 112 Or App 143, 145, 826 P2d 1060 (1992). The state must also establish, again by clear and convincing evidence, that the person's inability to obtain the particular commodity or service will result in a "likelihood that the person probably [will] not survive in the near future." *Id.* at 146.

In finding that appellant is unable to provide for her basic needs, the majority mistakenly equates this case with *State v. Johnson*, 117 Or App 237, 843 P2d 985 (1992). In *Johnson*, the appellant had no money or source of income and was homeless, pregnant, and suffering from starvation. We rejected the sufficiency of the appellant's proposed plan to live with her sister or to obtain housing at the local YWCA because she had not seen her sister for several years and had no money to pay for housing. Furthermore, we found that the appellant

"had no credible plan to acquire adequate nutrition in the future. Her history of failing to follow through with plans for her care demonstrates that she probably would not carry out a plan to obtain food if she had one."

*Id.* at 240. We concluded that the appellant was unable to provide for her food and shelter and affirmed the trial court's commitment order.

In contrast to *Johnson*, appellant in this case had housing at the time of the proceeding, was not pregnant, was not suffering from starvation, and was receiving an income through Social Security. The majority nevertheless argues that this case is similar to *Johnson* because appellant was about to be evicted from her residence and had no feasible plan for future housing. In *Johnson*, however, the appellant's

mental condition "impair[ed] her ability to recognize that shelter is a basic need." *Johnson*, 117 Or App at 240. Here, in contrast, appellant fully realizes the importance of housing. She has lived in her current residence for nearly a year, and before that, she lived in a similar residence. The state presented no evidence to indicate that appellant has a history of being homeless or of being unable to find a place to live.

Appellant testified that she had a "good idea" where she was going to live next, and her testimony was corroborated by the precommitment investigator, who reported that appellant had "instructed her [mental health service] money manager to send an application fee to a building where she [had] found an apartment and wanted to move." Despite that evidence, the majority concludes that "[t]here was no evidence that [appellant] had any place to go after she was evicted, nor was there any evidence that any place would accept her in her current condition." 178 Or App at 518. The majority's reasoning seems to suggest that the onus was on appellant to prove that she was able to secure housing rather than on the state to prove that she could not. Because appellant presented evidence that shows that she knows the importance of housing and has the resources to procure it, I would find that the state failed to establish by clear and convincing evidence that appellant is unable to provide for her housing needs.

The evidence also establishes that appellant is able to provide herself with food. In *Johnson*, the appellant became seriously malnourished whenever she was not under a doctor's care, and the appellant's pregnancy increased her nutritional needs. We were not persuaded that the appellant would be able to provide for her nutritional needs because of her history of failing to follow through with her care. *Johnson*, 117 Or App at 240. There is no comparable evidence in this case.

Appellant testified that she prepares meals in a microwave and does her shopping at Fred Meyer. She also testified that she was on a specialized diet to control her diabetic condition. The majority questions appellant's ability to follow that diet, but that issue is irrelevant to whether appellant is able to provide for her basic needs. While medical care

to forestall a life-threatening medical condition can be a basic need, *State v. Brungard*, 101 Or App 67, 71, 789 P2d 683, *mod on recons* 102 Or App 509, 794 P2d 1257 (1990), *rev den* 311 Or 427 (1991), there is no evidence that appellant's life is threatened by her diabetic condition or that failing to follow the diet for her condition would threaten her life. Consequently, appellant's diabetic condition has no bearing on her ability to provide for her basic needs.

In *Johnson*, the appellant's life was threatened by starvation because of her inability to provide herself with food. Here, appellant is able to provide herself with food. Because the record indicates that appellant shops and cooks for herself, I would find that appellant is able to provide herself with food.

Appellant is able to provide herself with both food and shelter, and there is no evidence that she needs any life-saving medical care. I would conclude, therefore, that the state failed to establish by clear and convincing evidence that appellant is unable to provide for her basic needs. I dissent from the majority's contrary conclusion.