Argued and submitted August 18, affirmed October 22, 2003

In the Matter of Mary Cunningham,
Alleged to be a Mentally Ill Person.

## STATE OF OREGON,
*Respondent,*

*v.*

## MARY CUNNINGHAM,
*Appellant.*

020868606; A119327

78 P3d 125

Thomas A. Coleman argued the cause and filed the brief for appellant.

Celeste Mountain, Certified Law Student, argued the cause for respondent. On the brief were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Denise G. Fjordbeck, Assistant Attorney General.

Before Landau, Presiding Judge, and Deits, Chief Judge, and Schuman, Judge.

LANDAU, P. J.

## LANDAU, P. J.

The trial court committed appellant to the custody of the Mental Health Division on the ground that, because of a mental disorder, she was unable to provide for her basic personal needs and was not receiving the care necessary for her health or safety. ORS 426.005(1)(d)(B); ORS 426.130. On appeal, appellant argues that the state failed to carry its burden for committing her against her will. On *de novo* review, *State v. O'Neill*, 274 Or 59, 61, 545 P2d 97 (1976), we affirm.

The relevant facts are undisputed. Appellant was diagnosed with bipolar disorder and placed on a hospital hold due to her purported inability to meet her basic needs. Pursuant to ORS 426.070, Greg Monaco conducted a precommitment investigation several days after appellant was placed on hospital hold. During that investigation, appellant showed Monaco a copy of a restraining order that her son had filed against her, acknowledged a 40-pound weight loss over the preceding "couple of months," and indicated that glass was cutting into her and that she was frustrated with the hospital staff for their refusal to give her vitamin E to treat it. Appellant further indicated that she had been staying in a battered women's shelter to which she would return if discharged and that, in addition to monthly benefits, she would have additional income from "widening * * * the transmission lines at the PacifiCorp tower." Appellant denied any need for psychiatric medications.

Monaco's report stated that, while appellant was alert and oriented, she lacked judgment and insight and expressed delusional fears and beliefs regarding her family. Monaco's diagnostic impression was that appellant suffered from bipolar disorder, was manic, and also suffered from hypertension and a heart murmur. As evidence that appellant was unable to provide for her basic needs, Monaco noted, among other things, that she was "disconnected" from her monthly benefits, had lost 40 pounds, and was unable to care for her hypertension or heart murmur. Monaco concluded that appellant seemed "to be spinning out of control and without stabilization [would] probably * * * be increasingly unable to care for herself."

A commitment hearing was conducted two days after that investigation. The court held a colloquy with appellant pursuant to ORS 426.100. During the course of the judge's efforts to inform appellant of her rights, appellant repeatedly interrupted to inform him that, among other things, she was taking "vitamin E for bleeding arteries" and Ativan because "it relaxes my arteries so the blood doesn't come up so much." Appellant denied having heart murmurs, claiming that "[t]hose are valves that are dead and cut into by the glass." Appellant indicated that she wished to return to the hospital to be "looked at in surgery" but that she did not need to be placed in the "psych ward."

At the hearing, Dr. Sue Beattie and Dr. Jerry McCubbin, both certified examiners, questioned appellant regarding her ability and plans to meet her basic needs. The transcript of the proceeding indicates that appellant's thought processes were disjointed. She rarely answered a question directly and responded to many questions with rambling, apparently delusional monologues.

When McCubbin asked appellant whether she thought she had a mental disorder, appellant responded that she had "post-traumatic stress syndrome" but that she was "over it now" because she had been prescribed "3,000 * * * I.U. * * * of vitamin E." When asked whether she had ever been diagnosed with bipolar disorder, appellant responded, "I have had a bad psychiatrist who is going to lose his license. I have a psychiatrist. I have been gone through psychologically like you wouldn't believe in Waynesburg, Pennsylvania. If I ever go over, I'll go catatonic. * * * I'll shut this damn world out. * * * I'm not bipolar." When asked about the medications she was taking, appellant again stated that she was taking vitamin E and that she was also taking Ativan because "it relaxes my veins so that the glass doesn't cut so badly at me." After McCubbin asked where the glass came from, appellant responded with a lengthy and disjointed description of the perceived misdeeds of various relatives and acquaintances.

Beattie also questioned appellant regarding her plans for obtaining housing and financial support. She began by asking where appellant was living and what she intended

to do if she were discharged from the hospital. Appellant stated, "Well, I'm buying a house—I'm going to buy the PacifiCorp's towers so that they don't go sidewards." When Beattie pressed appellant to be specific about where she would stay that evening, appellant stated, "Probably back over where—at the starting point." The following exchange occurred between Beattie and appellant:

"Q   What is the starting point?

"A   It's in Columbia County. It's quiet. It's a battered—well, it's not a battered women's shelter. It's actually kind of a neat place because you have the Job Corp[s] and things right across the street, free stuff.

"Q   Have you stayed there before?

"A   Yeah, when Dugin didn't show up here and went to Coos Bay instead. He's psychotic. I wouldn't have put my body in danger.

"Q   Are you in danger?

"A   He—no. I've already talked to the U.S. Attorney General. I don't think so, unless it's from Turley and her crowd.

"Q   When is the last time—when were you last at Starting Point?

"A   Oh, a week or so ago.

"Q   A week or so ago?

"A   Yeah. I was meeting with Greg Landers, my accountant, so I stayed at the Salvation Army, the no-tell Motel.

"Q   Okay. Where do you get your income?

"A   My daughter owes me a lot of money. I've spent every dime I made—

"Q   Okay.

"A   —(inaudible) and my daughter, every penny of it. My income will come from a contract with PacifiCorp to widen the large lines—

"Q   Uh-huh.

"A —so that they don't kill birds. Because the environmentalists don't like it when the eagles and the hawks flock together. And I have a (inaudible) from PacifiCorp saying, 'Please do it. Help us out.'

"Q Okay.

"A I am willing to take the contract because I do real estate title. That's what I was doing with PacifiCorp. You can't just walk out here—

"Q Okay.

"A —and widen—

"Q Okay.

"A —a line because you don't have the air rights over their property.

"Q Well, and that's income that I am assuming (inaudible)?

"A That's going to be my con—as soon as I can get to it.

"* * * * *

"Q How do you afford to live right now, given that you don't have that contract?

"A Well, my daughter said she'd wire me some and— once Terry Dugin quits beating up on her.

"Q Okay. Do you—

"A She owes me a lot of money.

"* * * * *

"Q Okay. Have you recently lost a bunch of weight?

"A Oh, I took Jamba Juice. I've got a great naturopath.

"Q Okay.

"A When I left PacifiCorp I was, like, 40 pounds overweight. But I was learning all kinds of new technology and law out here. And so I walked seven or eight miles a day and I drank Jamba Juice and [took] all the supplements normally that Dan Sims has. He looked—

"Q How can you afford to do that?

"A I work for a living.

"Q Okay. But right now you don't have any income and you don't have a place—

"A Right now I don't have a cent in income.

"Q Okay.

"A I had to send the Washington County Sheriff in to get PacifiCorp's last check and my Social Security check. He's got—

"Q You're on Social Security?

"A I get $540 in Social Security.

"Q Every month? Okay.

"A Yeah."

The court also questioned appellant in an effort to determine how she felt about returning to the psychiatric unit. Appellant again insisted that she needed surgical attention, that she did not suffer from a heart murmur but, rather, from glass cutting into her, and that she was receiving the vitamin E she needed for her ailments. Appellant's responses again devolved into another disjointed and apparently delusional monologue. When the court again attempted to determine appellant's position on being returned to the care of psychiatrists, appellant stated, "They are not surgeon[s], Sir."

"THE COURT: No, they're not.

"[APPELLANT]: Okay. Would—if you'd like to see my toe, I'll be happy to show it to you. It's got red blood underneath it, as well as old blood from all this nonsense between—

"If my children would quit marrying, I'd get on with my companies. In fact, here's—I'm supposed to teach at PSU in November. I haven't even had time to make that out.

"THE COURT: Well, what would you be teaching at PSU?

"[APPELLANT]: 1 and 1 are 2. It's not Enron.

"THE COURT: That's what you would be teaching?

"[APPELLANT]: Don't cook the books. Yes. I've got all my credentials with me if you want to see them. I've got—

I'm a geologist. I've worked with psychiatrists and psychologists. * * * I've got my—my CPA is with me. I've got a resume with me, if you want to see it, in terms of energy."

McCubbin and Beattie submitted reports based on their observations of appellant during the hearing. Both concluded that appellant suffered from a mental disorder, that she was unable to provide for her basic needs, and that she would not cooperate with and benefit from voluntary treatment. Both examiners recommended that appellant be committed to the Mental Health Division. Beattie's diagnostic impressions of appellant were that she was overproductive verbally, delusional and tangential, and that there was "no question that [appellant was] currently manic." Her report noted that appellant was fixated on delusional material with paranoid and persecutory themes. The report also noted that appellant was both verbally out of control and unable to organize her thoughts: "In [her] current condition [it is] hard to imagine she could focus long enough to attend [to] her basic needs." Beattie's report concluded that appellant's "[t]houghts are so disorganized and verbalizations so out of control that it is impossible to imagine that she could manage to stay in a shelter. Mania [is] so acute it is untreatable out of [a] hospital."

McCubbin's report stated that appellant's responses were so tangential that it was difficult to interview her and that she appeared to be suffering from a mania typical of bipolar disorder. He also stated that she was unable to form a reasonable plan for obtaining shelter and sustenance and that she appeared unable to manage her affairs due to her condition. McCubbin's diagnostic impressions were that appellant suffered from bipolar disorder with delusions, as well as a schizoaffective disorder, concluding that she was unable to care for her basic needs as a result of her mania and disorganized thinking.

The trial court adopted the findings and conclusions of the examiners and incorporated them into its decision. The court concluded that appellant was so preoccupied with thoughts over which she had no control that she would be unable to seek shelter or food. It found by clear and convincing evidence that appellant suffered from a mental disorder,

was unable to provide for her basic personal needs, and was not receiving the care necessary for health or safety. The court further found that appellant was unable, unwilling, or unlikely to participate in treatment on a voluntary basis and that a conditional release was either unavailable or not in her best interest. The court ordered appellant committed to the Mental Health Division for a period not to exceed 180 days.

■ On appeal, appellant concedes that there was sufficient evidence to prove that she suffered from a mental disorder, but contends that the evidence was insufficient to establish that she was unable to meet her basic needs. Appellant argues that the nexus between her mental disorder and an inability to provide for her basic needs was not adequately established and that, in any event, there was no evidence in the record indicating that she could not provide for her basic needs.

The state responds that the evidence presented at the hearing was sufficiently clear and convincing to establish that, due to a mental disorder, appellant was unable to provide for her basic needs at the time of the hearing. The state points to appellant's refusal to take the medication that would ameliorate her condition as direct evidence that she was not receiving appropriate levels of care and was unable to provide for her basic needs. The state also points to appellant's homelessness and her inability to formulate a reasonable plan for providing for shelter and income, her denial of any mental health issues combined with her efforts to treat an imaginary illness, and her recent loss of 40 pounds. The state further notes that there were no friends or family able to provide appellant the resources needed for survival.

■ A person is subject to a basic needs commitment if the state proves by clear and convincing evidence that the person would likely not survive in the near future because that person is unable to provide for their basic needs due to a mental disorder and that person is not otherwise receiving the care necessary for health and safety. *State v. Nguyen*, 180 Or App 541, 546-47, 43 P3d 1218 (2002). Basic needs are those things necessary for survival such as food, shelter, and life-saving medical care. *Id*. " 'Clear and convincing evidence'

means that the 'truth of the facts asserted is highly probable.' " *State v. Stephens*, 178 Or App 31, 38, 35 P3d 1061 (2001) (citation omitted). However, "the state need not postpone action until the individual is on the brink of death. The goal of the commitment statute is safe survival, not merely the avoidance of immediate death." *State v. Bunting*, 112 Or App 143, 145, 826 P2d 1060 (1992).

In this case, the evidence demonstrates that it is highly probable that, as a result of a mental disorder, appellant would likely not survive safely in the near future. Appellant concedes that she suffers from a mental disorder. That mental disorder generates mania, disorganized thinking, and delusional fixations that make it impossible for appellant to focus on her immediate situation long enough to formulate and execute a plan for survival. It is, therefore, highly probable that appellant, if left to her own devices, would be unable to provide for her basic needs, such as shelter and food, in order to ensure her safe survival in the near future. Furthermore, appellant had no alternative resources available to provide the care necessary for health and safety.

Appellant's testimony at trial indicated that she was only momentarily able to focus on her immediate situation before becoming sidetracked by her delusions. The examiners' reports and precommitment investigation indicate that appellant's disorganized and delusional thought processes, brought on by the mania that resulted from her bipolar disorder, rendered her incapable of providing for her needs. Appellant refused to recognize that she was suffering from any mental disorder and refused to take the medication that would alleviate her mania. The record includes a "Notice of Treatment Prior to Hearing" that indicated that appellant had been ordered to take Zyprexa, an antipsychotic drug, and Ativan, an antianxiety agent. According to the notice, appellant had refused to take the Zyprexa as ordered but had taken the Ativan for sleep.

■■ The refusal to take medication is not sufficient, by itself, to prove an inability to provide for basic personal needs if it produces only a speculative threat. *State v. Baxter*, 138 Or App 94, 98, 906 P2d 849 (1995). However, when an individual cannot function without medications, refusal to take

them is evidence of such an inability. *State v. Woods*, 119 Or App 502, 503, 850 P2d 1172 (1993).

In this case, while appellant's bipolar disorder alone was not life threatening, the mania that it induced at the time of trial interfered with her ability to provide for her needs to the degree that she could not function without medication to treat it. As shown by appellant's testimony and the conclusions of the mental health professionals who questioned her, appellant's disorder led to a genuine—as opposed to speculative—threat that she would be unable to provide for her needs.

In that regard, it is important to note the apparent degeneration of appellant's cognitive faculties between the time of the precommitment investigation and the commitment hearing. According to the precommitment investigator, appellant had indicated that she would return to a battered women's shelter if released from the hospital and that she received Social Security income as well as income from "widening the transmission lines at PacifiCorp's towers." By the time of the hearing, appellant could not identify where she would stay if released from the Mental Health Division and claimed a number of apparently imaginary sources of income, admitting at the same time that she actually had no income. When asked where she would stay, appellant first indicated her intention to purchase the PacifiCorp towers so that "they don't go sidewards." When pressed for a more definite answer, appellant mentioned a shelter—"the starting place"—but was unable to describe what sort of shelter it was or where precisely it was located. When asked whether she had stayed there before, appellant described a different location altogether.

As to providing herself an income, appellant claimed a number of apparently imaginary occupations and potential sources of income. At one point, appellant indicated that she received a retirement benefit from Social Security, but the precommitment investigation indicated that she had been cut off from her benefits. At another point, appellant admitted that she had no source of income whatsoever. Further proof of appellant's inability to provide for her basic needs was the fact that she had lost 40 pounds in the preceding

"couple of months." *See State v. Jayne*, 174 Or App 74, 82, 23 P3d 990, *rev den*, 332 Or 316 (2001) (evidence that the appellant had lost 25 pounds over a period of one year indicated that she was not eating properly, which was one consequence of the appellant's untreated bipolar disorder and supported the conclusion that the appellant was "mentally ill").

■       Generally, when an individual can articulate a reasonable plan for obtaining the necessities of life and has a demonstrable ability to support himself or herself, a civil commitment is inappropriate because there is no clear and convincing evidence that the individual cannot provide for his or her basic needs. *See, e.g., State v. North*, 189 Or App 518, 524-25, 76 P3d 685 (2003) (reversal of basic needs commitment based, in part, on the appellant's testimony indicating "that he understood the need for shelter, as well as the intricacies of obtaining it"). But, where a person is incapable of articulating a reasonable and credible plan for providing for the person's needs, we have upheld the trial court's order of civil commitment. *See, e.g., Jayne*, 174 Or App at 82 (basic needs commitment affirmed in part because mental disorder rendered appellant unable to manage her finances in order to provide for housing); *State v. Johnson*, 117 Or App 237, 240-41, 843 P2d 985 (1992) (basic needs commitment affirmed because appellant had no credible plan to provide for her basic needs, had demonstrated a history of failing to provide for herself, minimized the danger from malnutrition, and had no friends or family willing to assist her in meeting her needs). In this case, appellant is unable to articulate any realistic plan to provide for her housing and sustenance.

Finally, there is no evidence that appellant had any friends or family willing or able to assist her in providing for her basic needs. The record shows that appellant's son had obtained a restraining order to prevent her from contacting him. Appellant also stated that her daughter, who the record shows lives in Kansas, owed her a lot of money and had promised to wire her some "once Terry Dugin quits beating up on her," but she was not capable of assisting her mother at the time of the hearing. Finally, in the course of her testimony, appellant referred to numerous acquaintances, but the descriptions of her relationships with those people were so disjointed that it is impossible to say with any certainty

whether any of those people actually exist, much less whether they could assist appellant.

In sum, we find by clear and convincing evidence that appellant was unable to meet her basic personal needs due to a mental disorder and was not otherwise receiving such care as is necessary for health or safety. As such, she was mentally ill under ORS 426.005(1)(d)(B) and was properly committed to the Mental Health Division. ORS 426.130.

Affirmed.