Argued and submitted April 8, reversed August 11, 2004

In the Matter of Helen Shorett,
Alleged to be a Mentally Ill Person.

STATE OF OREGON,
*Respondent,*

*v.*

HELEN SHORETT,
*Appellant.*

03C10173; A120492

95 P3d 1146

Steven H. Gorham argued the cause and filed the brief for appellant.

Jas. Jeffrey Adams, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Linder and Ortega, Judges.

ORTEGA, J.

## ORTEGA, J.

Appellant appeals a judgment declaring her to be a mentally ill person and committing her to the Mental Health Division. The trial court found that appellant was unable to provide for her basic needs and was not receiving such care as was necessary for her health or safety. *See* ORS 426.005(1)(d)(B); ORS 426.130. On *de novo* review, ORS 19.415(3),[1] we reverse.

We consider the facts as they existed on January 23, 2003, the date of the hearing. *State v. North*, 189 Or App 518, 520, 76 P3d 685 (2003). At that time, appellant was being held at the Oregon State Hospital (OSH) in Salem. She had been committed to OSH on December 3, 2002, pursuant to ORS 161.370 after being found unfit to proceed in Lane County Circuit Court on two criminal charges of second-degree criminal trespass. The first charge arose when appellant allegedly entered a restaurant and stayed for several hours, refusing to order food or to leave. The second arose when, two days later, appellant similarly refused to leave a grocery store. Appellant's time at OSH was to expire on January 16, 2003, but on January 14, 2003, she was placed on a hospital hold at OSH because, according to OSH physicians, she "continued to be actively symptomatic, with irrational hostility, confusion about identities, pressured and demanding speech, irritable mood, and intrusive behavior." The commitment hearing at issue followed.

A certified mental health investigator conducted a precommitment investigation two days before the hearing,

---

[1] The legislature amended ORS 19.415(3) in 2003. Or Laws 2003, ch 576, § 88 ("Upon an appeal from a [*decree*] **judgment** in a **case that constituted a** suit in equity **under common law**, the Court of Appeals shall try the cause anew upon the record." (Additions in boldface; deletions italicized in brackets.)). We need not decide whether the 2003 amendments to ORS 19.415(3) affect our standard of review because those amendments apply only to the appeal of judgments that were entered on or after January 1, 2004. *See* Or Laws 2003, ch 576, § 90a ("The amendments to ORS * * * 19.415 * * * by sections 85 to 89 of this 2003 Act apply only to the appeal of judgments entered on or after the effective date of this 2003 Act. Any appeal of a judgment entered before the effective date of this 2003 Act shall continue to be governed by the law in effect on the day immediately preceding the effective date of this 2003 Act."). Based on the plain meaning of the text of Oregon Laws 2003, chapter 576, section 90a, we apply the 2001 version of ORS 19.415(3) in this case.

and two certified mental health examiners evaluated appellant the morning of the hearing. All agreed that appellant had a mental disorder, was not able to provide for her basic personal needs, and would not cooperate with and benefit from a program of voluntary treatment, and all recommended commitment. They diagnosed her as bipolar and as suffering from paranoid schizophrenia. The investigator noted that, at their meeting, appellant "appeared well-groomed and appropriately dressed" but described her demeanor as "somewhat hostile, paranoid and pressured," and "overtly delusional," noting her comment that "[p]eople mistake me for an attorney." He noted that records of appellant's recent confinement at OSH indicated that she exhibited "prominent manic behavior, ebullient and labile mood, hyperactivity, irrational, hostility, irritability—daily and ongoing." One of the examiners stated that, on the day of the hearing, appellant was "[v]ery paranoid, grandiose, [and had] difficulty understanding what is going on," and expressed the concern that appellant "is so focused on her paranoid thoughts * * * [and] has [such] difficulty understanding what is going on, it would be difficult for her to focus on behaviors needed to provide basic needs. * * * She perseverates so much, she has difficulty organizing herself." The other examiner observed that appellant's "[g]eneral attitude is paranoid and suspicious. Much content is irrelevant to the issue. Still manic, paranoid, probably some psychotic elements."

Appellant previously has been hospitalized for mental illness in Washington, with several short-term and one long-term hospital stay. She was admitted once before to OSH for seven months in 1999 to 2000. Since her release from OSH in 2000, appellant has been admitted to Lane County Psychiatric Hospital multiple times but has not independently followed up with mental health care.

At the time of the hearing, appellant was receiving Social Security disability payments and was covered by the Oregon Health Plan. However, her housing arrangements at that time are not clear from the record. Although one of the mental health examiner's reports indicated that appellant had "[n]o current housing, [and] would need to organize herself enough to find it," appellant was not asked at the hearing

whether she currently had housing. She volunteered that she was looking for housing when she was taken into custody:

> "I would hope that in terms of released, that I would have some time to be able to call and see if the apartment which I had called and contacted, there would be a return of my property which had family members and phone numbers and places I was going to rent. I worked very hard at finding an apartment which was almost denied because of lack of difficulty—I was having difficulty finding housing and someone interceding and saying that I hadn't worked properly in the field and my housing—there was someone that [was] making housing very difficult. So the point is, I had very positive things lined up. I was en route to rent a place. I had money in hand and hopefully that will be returned by whoever picked up my check. I had checks in hand and I was en route on a bus but I was interceded and taken into custody. I was going to stop and get breakfast first."

Appellant also testified that she was on her way to sign a lease for a particular apartment. She was not asked where the potential housing was located, whether she had the money to pay for rent or deposits, whether that housing was still available at the time of the hearing, or what arrangements she would make if that housing were no longer available. We also have no information on how, or whether, appellant was obtaining food before her arrest.

Appellant also testified that, at the time of her arrest, she was on her way to pursue a job: "I was en route to signing the papers of a new job and (inaudible) and subsequently taken from a restaurant * * *." She testified that, on her release, one of the things she would do "would be to go in and contact consultants as well as colleagues and see whether or not the position that we had negotiated (inaudible) that I substantially negotiated would be still available." When asked what the position was, appellant responded, "It's in a field that I choose not to reveal at this time. (Inaudible) just for your own information, some of which may or may not tie into what's going on right now."[2] It is unknown whether

---

[2] Appellant reportedly graduated from the University of Oregon in 1986 with a degree in "pre-med," and, according to the precommitment investigation, "had been quite successful in life until she had her first bipolar experience," which occurred four or five years before the hearing at issue here.

she had a job at the time of her arrest or whether she had financial resources besides Social Security.

Appellant was apparently in denial about her mental illness. When the precommitment investigator asked her if she believed she had a mental illness, appellant responded:

"Only at times when I've been frustrated with people who seem to want me to be involved in the legal system, despite the fact that my family has many lawyers, as well as judges, as well as my grandfather was a state senator from another state, and there are many people who have approached me throughout the years (inaudible)."

When asked if she was aware of her diagnosis of mental illness, appellant said:

"You know, what's interesting is that diagnosis was never written down in a format in which it could be documented and verified. They refused to write it down on a piece of paper. I asked for it and he refused. I asked him to sign a legal document so that I could bring it here and he refused."

Appellant also stated that she was on medication as part of a clinical study.

Appellant took her medications while at OSH, although the precommitment investigation indicated that she has "a history of refusing medications as well as any other form of psychiatric treatment inpatient and outpatient." In her own words, appellant "had been 100 percent compliant with my medication [while at OSH], despite having adverse reactions, and I had been compliant and cooperative on the unit and tried to leave and exercise, take some weight off, good hygiene, in terms of keeping in close contact with my family." When asked why she had not followed up for treatment at Lane County Mental Health in the past, appellant refused to answer without consulting an attorney due to concern about "discrepancies" in her response. Appellant testified that she wanted to "[s]tay in good health and if I need psychiatric medicine and my physician and I agree when I see an outpatient psychiatric physician and hopefully have a review and have a continuance of the medication I'm on so there's continuity in care."

Appellant appeared conscious of her health needs in other areas. When asked to describe herself, she said:

> "I'm a little overweight. I've got some graying hair but I have a good sense of humor and I've been walking in the unit, taking good care of my basic needs which at this age, I'm not 20, I'm not 30, I'm not even early 40s. I'm probably pre-menopausal. I've got some hormonal things going on. I had an allergic reaction to some of the medications which I've been documenting with a medically trained person keeping tabs on fluctuations in blood pressure as well as strong edema in the lower extremities and marked weakening. I've had a substantial weight gain since I've been there but that could be just swelling and adverse reactions to those medications. And I am walking and exercising and trying to do a few things to help and having chances to go outside and get a (inaudible) absorption of calcium and vitamin A and B to give the body for bone density testing. In January I usually get my teeth clean, my breast exam and physical exam once a year, besides good, basic health."

However, OSH personnel stated that she "has been uncooperative with treatment staff in regards to taking care of her basic needs." On January 21, 2003, appellant refused to leave the desk area, demanded to speak to a specific doctor, and seemed unable to understand that the doctor would not be available until the next morning. A progress note also stated that, on January 3, 2003, she was found "urinating in a trash can and wrapped self in toilet paper." When confronted with the latter two incidents at the hearing, appellant demanded documentation and eventually responded, "No comment," with regard to both incidents.

It was unclear whether appellant had access to family or other resources to assist her. She testified, "I talked to my dad before I went to court and he said (inaudible), please let us know and I simply called him this morning when I was told I was leaving for court." Appellant recognized that she needed community support: "I believe that I do need at this point in time support from my family, from the community and for my own personal well-being, my own diligence." She also commented that she wanted "to visit my family immediately and talk with them about the decisions that we as a family can take together and specifically to get in contact

with cousins who are the daughters of former judges, as well as the attorneys in another state." The precommitment investigator's report states that appellant "has little or no support in the community," but notes that "[her] family is apparently interested in her well-being, i.e. her father and two older sisters." It appears that some family members reside in Washington, although there was no indication that any of them visited appellant while she was in OSH and none attended the hearing. On the day of the hearing, appellant attempted to postpone the hearing in order to gather witnesses on her behalf:

> "I am willing by Monday to provide you with a list of people because they're names and addresses of people that could represent me or were taken into custody when I was there, and I could call my family members and say could I have the name and addresses of people who could support me."

However, appellant was unable to provide any names or phone numbers for witnesses on the day of the hearing. She also could not coherently respond to an examiner's questions about how she would arrange transportation to visit her family.

The trial judge signed an order of commitment, finding by clear and convincing evidence that appellant was mentally ill, that she was not willing or able to participate in treatment on a voluntary basis, and that she was unable to provide for her basic needs and would not, if released, receive such care as was necessary for her health or safety. *See* ORS 426.130(1)(b); ORS 426.005(1)(d). Appellant was committed to the Department of Human Services for a period not to exceed 180 days.[3]

---

[3] The commitment form actually committed appellant to the "State of Oregon Mental Health & Development Disability Services Division." Appellant's first assignment of error addresses the fact that no governmental entity by that name exists. Although such an agency formerly existed and was authorized under ORS 426.060 (1999) to receive committed individuals, the statute was amended in 2001 to refer instead to the Department of Human Services. *See* Or Laws 2001, ch 900, § 125. Our disposition of the third assignment of error—concerning the adequacy of evidence supporting a "basic needs" commitment—renders unnecessary any consideration of appellant's first assignment of error, or of her second assignment of error, which addresses the trial court's denial of appellant's request to postpone the commitment hearing.

Appellant now argues on appeal that the evidence was insufficient to establish that she was unable to provide for her basic needs, noting that she was seeking housing and a new job when she was arrested and that she willingly took her medication while at OSH. The state counters that the record contains clear and convincing evidence that appellant is unable to provide for her basic needs as indicated by appellant's history of refusing treatment and medication, her apparent lack of housing and employment at the time of the hearing, her history of inappropriate behavior in public, and her lack of local support.

A person is subject to a basic needs commitment if the state proves by clear and convincing evidence that "the person would likely not survive in the near future because that person is unable to provide for [her] basic needs due to a mental disorder and that person is not otherwise receiving the care necessary for health and safety." *State v. Cunningham*, 190 Or App 202, 210, 78 P3d 125 (2003). Basic needs are the things necessary for survival, including food, shelter, and life-saving medical care. *Id.* "Clear and convincing evidence" is evidence of "extraordinary persuasiveness," *State v. Linde*, 179 Or App 553, 559, 41 P3d 440 (2002), such that the "truth of the facts asserted is highly probable," *Cunningham*, 190 Or App at 211 (quoting *State v. Stephens*, 178 Or App 31, 38, 35 P3d 1061 (2001)). The state need not show that the individual is on " 'the brink of death' "; rather, " '[t]he goal of the commitment statute is safe survival, not merely the avoidance of immediate death.' " *Cunningham*, 190 Or App at 211 (quoting *State v. Bunting*, 112 Or App 143, 145, 826 P2d 1060 (1992)).

The state failed to meet its burden here. At the time of the hearing, appellant may well have lacked the ability to provide herself with food, shelter, or life-saving medical care, but the record does not demonstrate that to the requisite level of proof.

Appellant's history of refusing medication, by itself, is not sufficient evidence. The record indicates that appellant *was* compliant with her medication regimen at the time of the hearing and, although she apparently was in some degree of denial about her mental illness, she expressed willingness to

continue her medication in consultation with a doctor. Even if we were to assume that appellant would not have continued taking her medication, the refusal to take medication would not itself be sufficient to prove an inability to provide for basic personal needs without a showing that appellant cannot function without her medication. *Id.* at 211-12. The record here does not contain that showing, nor does it show that appellant's disorders are directly life-threatening so that medication is necessary to preserve her life. *See State v. Baxter*, 138 Or App 94, 97-98, 906 P2d 849 (1995) (noting that schizophrenia is not *"per se* life-threatening," so failure to take medication to control it does not show an inability to provide for basic needs).

■■ The record otherwise does not demonstrate by clear and convincing evidence that appellant's situation was such that she would "not survive in the near future." The state's concerns about appellant's lack of housing are speculative. Appellant testified that she was en route to secure housing when she was arrested for trespass. She claimed to have had "checks in hand," presumably for deposits or rent. We do not know where she was staying at the time of the arrest, nor do we know whether the housing that appellant claims to have been seeking would still have been available upon her release. Although appellant apparently was not employed at the time of her arrest (even though she testified that she was seeking employment), the record does indicate that appellant was receiving Social Security benefits at that time, showing an ability to access public services. *See North*, 189 Or App at 525 (the appellant's use of food stamps indicated an understanding of how to access public services). The record also indicates that appellant was at least in touch with family members, some of whom live in Washington (although she was unable to provide names and contact information for them as witnesses, or to explain how she would visit them), and that she believed "that I do need at this point in time support from my family, from the community and for my own personal well-being, my own diligence." The record does not establish that appellant was unable to secure housing. Indeed, we have held in the past that an allegedly mentally ill person has a sufficient plan where she simply "recognizes the necessity of some activity on [her] part to provide for [her]

survival." *State v. Strasburger*, 138 Or App 409, 416, 909 P2d 197 (1996); *see also North*, 189 Or App at 524 ("Appellant was never asked what he would do if he were evicted from his apartment, but his responses to other questions demonstrate that he understood the need for shelter, as well as the intricacies of obtaining it."). Appellant's effort to secure housing demonstrates such recognition on her part.

The record likewise contains no evidence to suggest that appellant was unable to feed herself. Appellant was not asked if she was able to cook for herself or shop for herself or where she ate in the community. The fact that she was arrested after staying in a restaurant without ordering for a long time does not aid our inquiry. The record does establish that appellant appeared conscious of her basic health needs, recognizing the need for exercise, weight management, and regular checkups.

The state also points to appellant's history of unmanageable behavior in the community as evidence that she is unable to provide for her basic needs. However, the few examples in the record—most prominently appellant's excessively long stays at establishments frequented by the public—do not demonstrate an inability to provide for her basic needs.

Finally, the state argues that appellant's lack of community support indicates an inability to care for her basic needs. Although appellant would certainly benefit from community support, the essential question is whether appellant is able to access the resources necessary for continued survival with or without such support. As discussed above, the state has failed even to show that appellant is unable to provide for her basic needs on her own.

The state failed to prove by clear and convincing evidence that appellant's condition and behavior threatened her survival in the near future. We therefore conclude that the state did not establish that appellant was unable to provide for her basic needs and that, accordingly, the trial court's conclusion that she was a mentally ill person within the meaning of ORS 426.005(1)(d) was in error.

Reversed.