Argued and submitted August 8, 2005, reversed April 5, 2006

In the Matter of Stephanie Pierce,
Alleged to be a Mentally Ill Person.

STATE OF OREGON,
*Respondent,*

*v.*

STEPHANIE PIERCE,
*Appellant.*

0303-64148; A121249

132 P3d 671

Liza Jane Langford argued the cause and filed the brief for appellant.

Linda Wicks, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Brewer, Chief Judge, and Breithaupt, Judge pro tempore.

BREWER, C. J.

## BREWER, C. J.

Appellant seeks reversal of an order adjudicating her to be a mentally ill person and committing her to the Mental Health Division. ORS 426.130(1)(b)(C). She asserts that the state failed to prove by clear and convincing evidence that, because of a mental disorder, she was unable to provide for her basic needs. ORS 426.005(1)(d)(B). On *de novo* review, *State v. O'Neill*, 274 Or 59, 61, 545 P2d 97 (1976), we reverse.

Police took appellant to the hospital after an incident at the Portland airport. Appellant had gone to the airport because "[s]omeone was getting [her] a ticket," but there was no ticket. Police went to the airport and took appellant to the hospital. While appellant was at the hospital, a precommitment examiner interviewed her twice. The precommitment examiner observed that appellant's "speech [was] loud, accented by rapid body movements, and flight of ideas." The examiner observed that appellant believed that various people wanted to kill her, that people in the hospital were talking about her, that her house was dangerous, and that people were setting fires everywhere she went.

The evidence at the commitment hearing consisted of the precommitment examiner's report, the reports of two hearing examiners, and appellant's own testimony. The precommitment examiner and the hearing examiners each diagnosed appellant with "paranoid schizophrenia vs. schizoaffective disorder." One of the hearing examiners observed that appellant "ranted on and on" and "never listened," that appellant "could only talk and her words came in flights," and that "everything she said sounded delusional." The same pattern was evident in much of appellant's testimony at the hearing. For most of the hearing, she behaved erratically and irrationally, speaking to her armpit, asking if the family law court or her attorney were part of the "mafia," and, referring to her own testimony, asking the judge, "Isn't this crazy behavior?"

Both examiners concluded that appellant's paranoid and psychotic state made her incapable of making rational judgments regarding her basic needs. The trial court agreed with the examiners. The court stated:

"[T]he Court * * * does believe that at this time [appellant's] mental state is so disorganized and so aggressive that if she were discharged she would be an immediate risk of death or serious bodily injury to herself, either from running into traffic, from her disorganization, or from confrontations with street people. And, certainly, the Court does not believe that she would return in her present state to her home or that she would be able to seek food or clothing, or even, as I said, the shelter of her current home."

Accordingly, the court committed appellant to the custody of the Department of Human Services.

■     On appeal, appellant does not take issue with the trial court's finding that she suffered from a mental disorder. Rather, she challenges the court's determination that she was unable to meet her basic needs.[1] In particular, appellant argues that the trial court disregarded her rational statements made in response to questions about how she would care for herself if discharged and that the court placed undue emphasis on the fact that she did not have a specific plan for lodging. The state disagrees, arguing that the evidence showed that appellant's mental disorder left her so disorganized and aggressive that she was unable to form a rational plan to meet her basic needs.

■■     ORS 426.005(1)(d)(B) defines a "mentally ill person" as one who, because of a mental disorder, is "[u]nable to provide for basic personal needs and is not receiving such care as is necessary for health or safety." For a basic needs commitment, the state must prove by clear and convincing evidence that, due to an allegedly mentally ill person's mental disorder, he or she is unable to obtain some basic personal need, such as food, water, or shelter, "without which he [or she] cannot sustain life." *State v. Turel*, 182 Or App 235, 240, 48 P3d 175 (2002) (internal quotation marks and emphasis omitted). "[T]he state's burden in 'basic needs' commitment cases is rigorous[.]" *State v. Linde*, 179 Or App 553, 559, 41 P3d 440 (2002). However, "the state need not postpone action until the individual is on the brink of death. The goal of the

---

[1] Appellant also argues that there was insufficient evidence to prove that she was a danger to herself. However, the trial court did not commit appellant on that basis, and the state does not cross-assign error to the court's failure to do so. Accordingly, we do not consider that issue.

commitment statute is safe survival, not merely the avoidance of immediate death." *State v. Bunting*, 112 Or App 143, 145, 826 P2d 1060 (1992).

The state is correct that, during much of the commitment hearing, appellant's answers to the court's questions suggested that her mental disorder affected her ability to make rational judgments. However, when asked about her living plan if she were discharged, appellant's answers were more rational and coherent. She gave a clear and detailed explanation of her current resources. She noted that her mother and sister were present at the hearing and that she "would at least be able to get lunch and dinner and maybe breakfast from them for tomorrow." Appellant opined that she could earn $150 over the weekend working at the Saturday Market, and, if she did not go to the market, that she could earn approximately $50 from "items that [she] could sell just going door to door[.]" She also gave a detailed explanation of the home that she owned, its size, its value, the fact that it was in foreclosure, that someone had already made an offer on it, and that she believed that she would receive approximately $20,000 from its sale. In short, to the extent that appellant's mental disorder affected her judgment, it did not impair her ability to rationally assess her resources and form a plan to provide for her basic needs.

The state minimizes the significance of the foregoing evidence. According to the state, appellant had no intention of living in her home, and therefore, she had no specific plan for lodging. The state also argues that, based on appellant's mental state at the time of the hearing, her plan to earn money at the Saturday Market or by going door-to-door "was not rational or practical." The state correctly observes that we have upheld commitments where the appellant had no firm plan for lodging *and* there was evidence that the appellant's mental and resulting physical conditions were worsening, that the appellant refused to acknowledge his or her mental disorder and refused to take medication for the disorder, or that the appellant did not recognize the importance of caring for himself or herself. *See State v. Cunningham*, 190 Or App 202, 212-13, 78 P3d 125 (2003) (commitment was appropriate where the appellant could not identify where she would stay and there was evidence of apparent degeneration

of her cognitive faculties between the precommitment investigation and the commitment hearing, evidence that she had lost 40 pounds in the preceding couple of months, and evidence that her stated sources of income were imaginary); *State v. Bolander*, 178 Or App 514, 518-19, 37 P3d 216 (2001) (the fact that the appellant did not know where she would live was a factor in upholding her commitment where evidence also showed that the appellant lacked "insight into what she need[ed] to do to protect herself in an unstructured environment"); *State v. Jayne*, 174 Or App 74, 82, 23 P3d 990, *rev den*, 332 Or 316 (2001) (court would not wait until the appellant was actually homeless before committing her where she had failed to take her medication and her deteriorating mental disorder left her unable to eat properly or manage her finances so that she had shelter).

On the other hand,

"when an individual can articulate a reasonable plan for obtaining the necessities of life and has a demonstrable ability to support himself or herself, a civil commitment is inappropriate because there is no clear and convincing evidence that the individual cannot provide for his or her basic needs."

*Cunningham*, 190 Or App at 213. In *State v. Shorett*, 194 Or App 587, 596-97, 95 P3d 1146 (2004), we noted that "we have held in the past that an allegedly mentally ill person has a sufficient plan where she simply 'recognizes the necessity of some activity on [her] part to provide for [her] survival.'" (Quoting *State v. Strasburger*, 138 Or App 409, 416, 909 P2d 197 (1996) (brackets in *Shorett*).) Furthermore, we have also held that, "[a]lthough the lack of certain shelter is not a good plan, we cannot say that homelessness by itself is sufficient grounds for commitment." *State v. Baxter*, 138 Or App 94, 99, 906 P2d 849 (1995).

This case is of the latter sort. Although appellant testified that she did not intend to live in her house, other evidence showed that she had a reasonable plan to provide for her basic needs. Appellant's mother and sister attended the hearing, and appellant believed she could receive temporary assistance from them. There was no evidence to the contrary. In addition, appellant described her plan to support herself

temporarily by selling items and testified that, "for at least for this week [she would] be able to earn enough money to get by." There was no evidence indicating that appellant's temporary plan was infeasible. Moreover, there was no evidence that appellant had ever experienced difficulty finding shelter with the help of family or friends, had suffered a recent loss of weight, or otherwise had failed to obtain adequate nutrition. Appellant noted her own history of providing for herself, despite her illness, when she said, "I have managed to find a place to eat and sleep for many, many years, and I think I'll be able to do it again." As in *State v. Powell*, 178 Or App 89, 95, 35 P3d 1084 (2001), "appellant's plan may address only her basic needs for the next week, but appellant's testimony as a whole indicates that she knew that she had money and that she had to use that money to meet her basic needs[.]"

Because the state failed to adduce clear and convincing evidence that appellant was unable to meet her basic needs, the trial court erred in determining that she was mentally ill and subject to commitment.

Reversed.