Submitted May 7, 2015, reversed June 8, 2016

In the Matter of F. H.,
A Person Alleged to have a Mental Illness.
STATE OF OREGON,
*Respondent,*

*v.*

F. H.,
*Appellant.*

Multnomah County Circuit Court
140260944; A156282

377 P3d 634

Garrett A. Richardson and Multnomah Defenders, Inc., filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Andrew M. Lavin, Assistant Attorney General, filed the brief for respondent.

Before Duncan, Presiding Judge, and Lagesen, Judge, and Flynn, Judge.

**FLYNN, J.**

The trial court committed appellant to the Oregon Health Authority for up to 180 days for treatment, based on a determination that appellant suffered from a mental disorder that rendered him unable to provide for his basic personal needs. *See* ORS 426.130(1)(a)(C). The court based its determination on concern that appellant, who was diagnosed as suffering from bipolar disorder, confused thinking, and "serious memory deficits," would be unable to locate shelter in what were "extreme weather conditions." Appellant contends that the record is legally insufficient to meet the high standard required for an involuntary civil commitment. We agree and, accordingly, reverse the order of commitment.

## APPLICABLE LEGAL STANDARDS

Before a court may order an involuntary civil commitment, there must be "clear and convincing evidence," that the person before the court is a "person with mental illness." ORS 426.130(1)(a)(C). As pertinent to this case, a "person with mental illness" is statutorily defined as "a person who, because of a mental disorder, is * * * [u]nable to provide for basic personal needs and is not receiving such care as is necessary for health or safety." ORS 426.005(1)(e)(B) (2013).[1] Whether the evidence in a particular case is legally sufficient to support a civil commitment is a question of law that we review for legal error. *State v. E. D.*, 264 Or App 71, 72, 331 P3d 1032 (2014).

We have explained that "'[b]asic needs [in the context of involuntary commitment] are those things necessary to sustain life.'" *State v. A. D. S.*, 258 Or App 44, 48, 308 P3d

---

[1] In 2015, the legislature both amended and renumbered ORS 426.005(1)(e)(B). The amended version, now ORS 426.005(1)(f)(B), provides as follows:

"'Person with mental illness' means a person who, because of a mental disorder, is one or more of the following:

"* * * * *

"Unable to provide for basic personal needs that are necessary to avoid serious physical harm in the near future, and is not receiving such care as is necessary to avoid such harm."

*See* Or Laws 2015, ch 433, § 1 (amending text); Or Laws 2015, ch 461, § 1 (renumbering subsection). The amendment took effect January 1, 2016. Or Laws 2015, ch 433, § 1. In this case we apply the 2013 version of the statute.

365 (2013) (quoting *State v. Herdan*, 129 Or App 24, 26, 882 P2d 605 (1994)(brackets in *A. D. S.*)). Thus, to establish that a person is unable to provide for his basic needs, the state must present "clear and convincing evidence that the individual, due to a mental disorder, is unable to obtain some commodity (*e.g.*, food and water) or service (*e.g.*, life-saving medical care) without which he cannot sustain life." *Id.*

Neither party has requested that we review this matter *de novo*, and this is not an "exceptional" case that warrants *de novo* review. *See* ORAP 5.40(8)(c) (providing that the court will exercise its discretion to review *de novo* "only in exceptional cases"). Thus, "[a]s in other equitable proceedings, 'we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome.'" *E. D.*, 264 Or App at 72 (quoting *Dept. of Human Services v. N. P.*, 257 Or App 633, 639, 307 P3d 444 (2013)).

## BACKGROUND

Appellant is a 66-year-old man with a history of bipolar disorder. Five days before the commitment hearing, he was found at Portland International Airport in a state described as "a little disheveled," with his belt unbuckled. A mental health professional, who came out to assess appellant's condition, testified that appellant was "pleasant to talk to" but "tangential" in answering some questions and, at times, became "verbally hostile." Appellant reported that he lived in Grants Pass with a woman named Marianne, but was unable to provide her contact information or last name. He said that he had driven to Portland and parked his car in the airport parking lot.

When asked about his plans for leaving the airport, appellant demonstrated confusion. He initially suggested that he would try to find a friend to stay with, although he could not name the friend, and then suggested that he would call his sister, but could not recall her telephone number and was unable to provide her last name. Because temperatures were predicted to be "around freezing level," and because appellant seemed to have no plan for where he would safely

spend the night and was wearing only a t-shirt and light sweatshirt, the mental health professional placed a "hold" on appellant and had officers take him to the hospital.

On the day of the commitment hearing, temperatures were in the "low 20's" with a "severe weather warning" and possible snow. The record includes evidence from two mental health examiners that appellant suffers from bipolar disorder with symptoms such as mood lability, quick irritability, and grandiose statements; that appellant "has serious memory deficits" and was "confused and disorganized in his thinking"; and that, because of appellant's confusion, he was "not able to handle things in a rational manner" and was making "highly impulsive, very poor decisions." One examiner testified that appellant's confusion and memory problems could have been caused by untreated "serious high blood pressure."

Appellant testified that he did not remember when he had come to Portland but that, about two months earlier, his sister had told him to leave his apartment in Grants Pass and had changed the locks. Since that time, appellant had not been taking his medication for high blood pressure and had been "just driving around, spending money." Appellant testified that his financial resources included cash, credit cards, and a monthly payment from social security. He also testified that he owned property in Germany.

In his testimony, appellant demonstrated confusion about whether he was in Grants Pass or Portland at the time of the hearing, about whether he had been found at the airport in Portland or Seattle and about where his car was, commenting that it "[c]ould be in Medford." He could not recall the circumstances under which he had been taken to the hospital from the airport and, at one point asked, "What incident at the airport?"

Appellant was unable to "give any concrete plans for his safe survival," according to one examiner, and another examiner testified that she could not "imagine him negotiating successfully for a motel room or anything else as he's in this highly irritable state, which is a symptom of a manic episode for Bipolar Disorder." At one point appellant

testified that, if released after the hearing, he would find a motel room and eat at restaurants. However, when the judge pressed appellant to identify the specific steps he would take to find shelter, appellant responded by changing the subject.

The trial court found that the state provided clear and convincing evidence that appellant suffers from a mental disorder—specifically bipolar disorder. The court also found that, "during the course of this hearing, [appellant] has been very emotionally labile; he has been confused, disorganized; he's had issues with his memory." Finally, the court found that appellant did not have "the judgment and the insight to understand the seriousness of the condition." Based on those findings, the court concluded that, although appellant had access to financial resources, he would be unable "to utilize those resources to his own benefit, to his safe survival." The court reasoned, "I can't see sending this gentleman out into a strange city, in horrible weather conditions, with his current emotional lability and all of the symptoms of his Bipolar Disorder, [and] with his memory deficits."

## ANALYSIS

On appeal, appellant does not dispute the finding that he has a mental disorder. Rather, he contends that the record is legally insufficient to support a determination that he was unable to provide for his basic needs, emphasizing the evidence that he had financial resources and a plan to obtain food and shelter after the hearing. The state responds that it presented clear and convincing evidence that appellant's bipolar disorder "left him so confused and disorganized that he was unable to find shelter in an unfamiliar city with extreme weather conditions."[2]

---

[2] The state also argues that appellant's failure to take medication for his high blood pressure condition renders him unable to provide for his basic needs. We reject that argument without detailed discussion, however, because the examiner testified only that this failure to take medication is "very concerning," without explaining any specific risk to survival. *See State v. M. A. B.*, 212 Or App 400, 405, 157 P3d 1256 (2007) (explaining that "'[t]he refusal to take medication is not sufficient, by itself, to prove an inability to provide for basic * * * needs,' unless the evidence shows that the allegedly mentally ill person 'cannot function without medication'" (quoting *State v. Cunningham*, 190 Or App 202, 211, 78 P3d 125 (2003))).

Whether the evidence in a particular case is legally sufficient to support a civil commitment is a question of law that we review for legal error. *E. D.*, 264 Or App at 72. We have emphasized that an involuntary commitment "cannot be based on apprehensions, speculations, and conjecture that an appellant cannot care for [his] basic needs." *A. D. S.*, 258 Or App at 48 (citing *State v. Miller*, 198 Or App 153, 160, 107 P3d 683 (2005)). Rather, there must be "clear and convincing evidence" demonstrating that "there is a likelihood that the person probably would not survive in the near future" because of the person's inability to provide for his basic personal needs. *Id.* (citing *State v. Bunting*, 112 Or App 143, 146, 826 P2d 1060 (1992)).

The evidence in this record is insufficient to establish by "clear and convincing evidence" that there is a "likelihood" that appellant "probably would not survive in the near future" because of an inability to provide for his basic personal needs. Indeed, it appears that the trial court accepted appellant's testimony that he had financial resources with which he could purchase food and shelter, and there is no evidence that the area surrounding the Multnomah County Courthouse—where the hearing was held—lacked sources of food and shelter.

Although there is evidence that appellant had "serious memory deficits," was "confused and disorganized in his thinking," was making "highly impulsive, very poor decisions" and had no local family or friends who could assist him in the immediate future,[3] the record permits no more than speculation that these conditions made appellant "unable to obtain some commodity (*e.g.*, food and water) * * * without which he cannot sustain life." *Id.* For example, there is no evidence that appellant's confusion and memory problems were new yet also no evidence that he had ever spent a night outside or failed to eat. Moreover, there is no evidence that appellant was confused about the need to seek food and shelter. Indeed, it is undisputed that, despite appellant's significant confusion on the night he was sent to the hospital, he had found his way to a warm public facility.

---

[3] In addition to describing a sister in Grants Pass who had rejected him, appellant testified that he remained on good terms and in occasional contact with a brother in Illinois.

Although we sympathize with the trial court's concern about "sending this gentleman out into a strange city, in horrible weather conditions," we have cautioned that "civil commitment is not intended to be used as a 'paternalistic vehicle' to 'save people from themselves.'" *State v. Olsen*, 208 Or App 686, 692, 145 P3d 350 (2006) (quoting *State v. Powell*, 178 Or App 89, 95, 35 P3d 1084 (2001)). Given the absence of any evidence that appellant's confusion and memory problems had previously prevented him from obtaining shelter, even though the problems were not new, the trial court's concern that appellant would be unable to protect himself was merely speculation. Thus, the evidence in this case does not establish a "likelihood" that appellant "probably would not survive" and does not permit involuntary commitment.

Reversed.