188 P.3d 368 (2008)
220 Or. App. 629
In the Matter of M.L.F., Alleged to be a Mentally Ill Person.
STATE of Oregon, Respondent,
v.
M.L.F., Appellant.
061272914; A134475.
Court of Appeals of Oregon.
Submitted May 23, 2008.
Decided June 25, 2008.
*369 Lance D. Perdue, Portland, filed the brief for appellant.
Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Samuel A. Kubernick, Assistant Attorney General, filed the brief for respondent.
Before HASELTON, Presiding Judge, and ARMSTRONG, Judge, and ROSENBLUM, Judge.
HASELTON, P.J.
Appellant seeks reversal of a judgment committing her to the Mental Health Division on the ground that she was a danger to herself. ORS 426.130(1)(b)(C); ORS 426.005(1)(d)(A). The state defends the trial court's determination and contends, further and alternatively, that appellant was unable to provide for her basic personal needs because of her mental disorder. ORS 426.005(1)(d)(B). On de novo review, State v. O'Neill, 274 Or. 59, 61, 545 P.2d 97 (1976), we reverse.
Appellant is a 60-year-old woman, with a schizo-affective disorder. At the time that she was hospitalized in December 2006, appellant was living on her own in an apartment, handled her own shopping, and prepared her own meals. Appellant was overweight and had diabetes, but she had not been prescribed insulin. Appellant had, however, been prescribed Coumadin, an anticoagulant medication, in response to an unspecified history of blood clots.
On December 8, 2006, appellant was hospitalized and held pursuant to a notice of mental illness after she became agitated and threatened to emasculate one of her neighbors and because she had stopped taking Coumadin. At the time of the commitment hearing several days later, appellant's Coumadin "level," while improved, was not yet restored to a "therapeutic level."
At the commitment hearing, appellant repeatedly, and cogently, explained that she had stopped taking the Coumadin because it made her urinate "all the time," which was very frustrating and inconvenient. When asked about a comment that she had made to a care provider about not taking her medication because she "wanted to die," appellant responded, "Yeah, I wanted to die because I [urinated] all over the place. It's no way to live, and I don't want to use diapers." When told by one of the examiners that "we're going to probably hear from [your] doctor because she's real concerned that you may die if you miss a dosage of your Coumadin," appellant replied, "Well we all die sometime."
The only physician who testified at the commitment hearing was Dr. Naimark, a first-year resident in psychiatry. Although the record does not disclose how long she had been treating appellant, Naimark was familiar with appellant's use, and nonuse, of Coumadin. When asked to describe the risk to appellant's health and safety *370 if she did not continue to take Coumadin, Naimark responded:
"There's a risk of developing blood clots which could cause stroke. And I believe this is because she has a trial fibrillation. SheI can't really comment further on that. I was actually going to ask for a cardiologist to see her which if sheif she stays that would be a consult."
When pressed for her opinion as to the risk appellant would face "in the next 36 hours if she was released and didn't take this medication," Naimark replied:
"Well  I can't  I can't really predict, but I  you know, she has been on [sic] her medication for an unknown period of timeI think a couple monthsand she hasn't had adverse events during that time."
Later, Naimark elaborated that her "main concern" was that appellant "would return to not taking her medications without getting input from a cardiologist whether or not she needs her medications." However, when again asked, directly, "Do you believe [appellant is] safe to be released today?" Naimark equivocated:
"I'm actually kind of on the fence on that. So that's where I am on that[.] So I'll leave that to the Court to decide."
(Emphasis added.)
Both of the mental health examiners, Mohler and Edelson, rendered the opinion that, because of the risk of not taking Coumadin at prescribed levels upon her release, appellant was a danger to herself. Specifically, Mohler referred to his personal "familiar[ity] with the Coumadin issue recently" and stated that appellant was "playing Russian roulette." Edelson characterized appellant as a "walking time bomb."
Neither Edelson nor Mohler is a physician. Edelson is a licensed clinical social worker. The trial court consistently referred to Mohler as "Mr. Mohler," and the record does not disclose his professional status or expertise much less his (or Edelson's) competence to render an opinion as to the nature, severity, proximity, and likelihood of medical risks that appellant faced if she discontinued her use of Coumadin upon release.
In closing argument, appellant's counsel highlighted the absence of expert medical testimony establishing the requisite risk:
"[T]he doctor who has a medical degree doesn't say she's at an immediate risk of serious physical injury or death if she doesn't take the Coumadin.
"She has concerns that she needs a cardiology consult to see if she needs to keep taking that. But she was off the Coumadin for about a couple months and didn't have any adverse events which suggests that may be what happenswe can speculate either way.
"It's possible she could have a problem. It's equally possible or more possible if we look at history that she's not going to have a problem and that's the evidence we have today. * * *
"* * * * *
"* * * The doctor also said, `I can't really predict what would happen if she was off of her medications for her heart.' So we can't say based on that that there's clear, convincing evidence that she's going to die or have serious physical injury if she doesn't take her medications."
The trial court rejected that argument, determining that, because of her mental disorder, appellant was a danger to herself. Specifically, the court observed:
"I will say that in this situation, both of the examiners who havewho are examiners of many years' standing have had a chance to fully review her chart and I believe are, at this point, more fully advised in the premises than our medical doctor."[1]
On appeal, appellant raises a variety of challenges, but we address only one because it is dispositive: The state did not present clear and convincing evidence that appellant was a danger to herself because of *371 the risk that she would stop taking Coumadin upon her release.
We briefly reiterate two fundamental principles. First, to prevail on the "danger to self" ground for commitment, ORS 426.005(1)(d)(A), the state must prove that ground by "clear and convincing evidence," ORS 426.130(1)(b)  that is, evidence that is of "extraordinary persuasiveness." State v. Howell, 53 Or.App. 611, 617, 633 P.2d 14 (1981); see also State v. Jayne, 174 Or.App. 74, 77-78, 23 P.3d 990, rev. den., 332 Or. 316, 28 P.3d 1176 (2001) (describing "clear and convincing" evidence as evidence establishing that "the truth of the facts asserted is highly probable").
Second, to establish that appellant is dangerous to herself, the state must show that appellant's mental disorder has "resulted in harm to [her]self * * * or created situations likely to result in harm." State v. Christofferson, 47 Or.App. 1087, 1090, 615 P.2d 1152 (1980); see also State v. Sea, 137 Or.App. 333, 338, 904 P.2d 182 (1995). Although "the danger to self standard does not require a threat of immediate harm[,]" "consistent with the basic needs standard, the threat must exist in the near future." State v. Jacobson, 142 Or.App. 371, 377, 922 P.2d 670 (1996). Thus, "[e]vidence of general mental and physical deterioration is insufficient to justify a finding of mental illness under the danger to self standard." Id.
Here, a reasoned determination of the alleged "danger to self" presented by appellant's potential discontinuation of Coumadin required expert medical testimony assessing the nature, severity, proximity, and likelihood of adverse physical consequences based on appellant's medical history and current condition. The state did not adduce such testimony. As noted, the only physician who testified, Naimark, candidly acknowledged that she was "kind of on the fence" as to whether appellant would be safe if immediately released, largely because Naimark believed that input from a cardiologist was required. Further, nothing in this record established that the mental health examiners were competent to render such a medical opinion. In all events, given Naimark's explicit equivocation, even if we were to somehow assume some degree of medical competence on the examiners' part, we would not find the evidence as a whole to be "clear and convincing."
We thus conclude that the trial court erred in determining that appellant should be involuntarily committed on the ground that, because of her mental disorder, she was a danger to herself. See State v. Nguyen, 180 Or.App. 541, 545, 43 P.3d 1218 (2002) (concluding that, because of lack of proof regarding nature and severity of the allegedly mentally ill person's diabetic condition, person's failure to take medication for that condition did not support commitment on "danger to self" ground); see also State v. Ayala, 164 Or.App. 399, 404, 991 P.2d 1100 (1999) (reaching same conclusion on "basic needs" ground: "Apprehensions, speculations and conjecture are not sufficient to prove a need for mental commitment.").
The state argues, nevertheless, that we should affirm on the alternative "basic needs" ground. To prevail on that ground, the state must adduce clear and convincing evidence that appellant "probably would not survive in the near future because [she] is unable to provide for basic personal needs and is not receiving care necessary for health or safety." State v. Bunting, 112 Or.App. 143, 146, 826 P.2d 1060 (1992). See also State v. Cunningham, 190 Or.App. 202, 211, 78 P.3d 125 (2003) (holding that "[t]he refusal to take medication is not sufficient, by itself, to prove an inability to provide for basic personal needs"; rather, state must prove that the allegedly mentally ill person "cannot function without medications").
In advancing its "basic needs" contention, the state (once again) relies primarily on the risk of appellant's possible discontinuation of the Coumadin.[2] That reliance is unavailing *372 for the reasons just expressed. See, e.g., State v. M.A.B., 212 Or.App. 400, 405, 157 P.3d 1256 (2007) (rejecting state's "basic needs" contention where evidence established that the appellant's high blood pressure generally elevated his risk of heart disease and stroke but evidence did not establish that those adverse effects were a "near future thing" or that the appellant would be unable to function if he stopped taking blood pressure medication); State v. Hayes, 202 Or. App. 63, 67, 121 P.3d 17 (2005) ("[T]he record does not disclose the nature or severity of appellant's diabetes, much less the consequences that she would likely suffer in the near future from her continued refusal to take medication or cooperate in testing.").
Reversed.
NOTES
[1] In addition to appellant's possible discontinuation of the Coumadin, the trial court relied on the fact that appellant's legs and feet were "grossly swollen" and there was an ulcerating sore on one of her legs. Edelson also noted those conditions in rendering her opinion but did not state that, if untreated, they presented a risk of serious physical injury in the near future.
[2] The state also refers, in passing, to Naimark's concern that appellant would not obtain input from a cardiologist regarding her heart condition. That concern, however, hardly demonstrates that appellant's mental disorder "so impairs [her] ability to provide for * * * necessary medical treatment as to jeopardize her probable survival in the near future." State v. Hayes, 202 Or.App. 63, 68, 121 P.3d 17 (2005).