213 P.3d 1279 (2009)
230 Or. App. 224
In the Matter of C.A.J., Alleged to be a Mentally Ill Person.
State of Oregon, Respondent,
v.
C.A.J., Appellant.
060261311; A136828.
Court of Appeals of Oregon.
Argued and Submitted January 20, 2009.
Decided August 5, 2009.
Liza Langford, Portland, argued the cause and filed the brief for appellant.
Anna M. Joyce, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.
Before EDMONDS, Presiding Judge, and SERCOMBE, Judge, and BARRON, Judge pro tempore.[*]
BARRON, J. pro tempore.
Appellant, an alleged mentally ill person, appeals from an involuntary mental recommitment judgment. ORS 426.307. She contends (1) that the trial court erred in finding that the state proved by clear and convincing evidence that she was "[u]nable to provide for basic personal needs and is not receiving such care as is necessary for health or safety," ORS 426.005(1)(d)(B), and (2) that there was not clear and convincing evidence that she failed to take insulin because of her mental disorder rather than her poor eyesight. The state points out that the second argument was not preserved, citing State v. Maxwell, 164 Or.App. 171, 172, 988 P.2d 939 (1999), rev. den., 330 Or. 71, 994 P.2d 133 (2000) (failure to object to late discovery of an examiner's report was not preserved because an objection was not made at the hearing); however, we do not address that question here because, as discussed below, the *1280 record shows that appellant's mental disorder causes her to be unable to administer her medications properly. We review de novo, State v. O'Neill, 274 Or. 59, 61, 545 P.2d 97 (1976),[1] and affirm.
Appellant was initially committed to the Mental Health Division for up to 180 days in February 2006. A recommitment hearing was held on August 23, 2007. At the hearing, the state called appellant's treating psychiatrist and her social worker as witnesses. They were the only witnesses to testify. Appellant did make unsworn statements at the hearing in response to questions by the examiner, the court, and the state's and appellant's attorneys.
The psychiatrist testified that appellant has a diagnosis of schizoaffective disorder that causes delusions and beliefs that people want to harm her and cause her problems. She has had that diagnosis for several years. Schizoaffective disorder's symptoms include disorganized thinking, paranoid delusions, and hallucinations. Other symptoms are impatience, irritability, and pressured speech. Appellant's medical conditions include insulin-dependent diabetes; chronic renal failure, mild to moderate, but not needing dialysis; and congestive heart failure. In 2005, appellant had to have a toe amputated because she was not managing her diabetes.
The psychiatrist had just recently become appellant's new treating psychiatrist, but had reviewed her record and interviewed her. The social worker had known appellant since 2005, had worked with her in the past, had helped in planning for her during her current stay, had seen her over 20 times in the last month of her stay at the hospital, and was very familiar with her history. Their testimony indicated that, up until 2005, appellant lived in less structured settings but that, since then, appellant has had exacerbations and recurrences of her symptoms and has not lived independently in "a sustained, successful way."
The psychiatrist testified that appellant was "hospitalized in April [2007] when she was in the less structured situation because she was too agitated to be maintained." Appellant, who admits that she has schizophrenia, told the psychiatrist that, in April, her symptoms of schizophrenia became worse, she was hearing voices, and she was unable to stay where she had been staying. Appellant stated that, before she was committed, she was being guided down a hill by friends of the staff where she was staying and could not stop because of her amputated toe. She ran into a car, suffered two broken arms, and was placed in two different hospitals because of her broken arms before being placed in the hospital where she has been since April 2007.
At the hospital, appellant checks her blood sugar levels by sticking her finger and gives herself insulin shots, but she does so under supervision, and, when she fills the needle to give herself a shot, the nurses have to adjust the amount of insulin when appellant does not have the correct amount. The psychiatrist testified that appellant does not recognize the need for supervision and that he was concerned about appellant's ability to check her blood sugar levels without it. Appellant interjected during the testimony of the psychiatrist that her blood sugar levels must be checked four times a day. Later in the hearing, appellant stated she has trouble with the morning check because her eyes "don't wake up in the morning."
The psychiatrist testified that, if appellant does not manage her blood sugar levels, they could become either too high or too low. If appellant does not take the correct amount of insulin, causing her blood sugar level to be too low, appellant could become confused, could pass out, and could have a brain injury. If appellant's blood sugar level becomes too high, appellant would become confused after a few days and therefore not take her insulin, and, if it becomes very high, she could become comatose. If appellant was partially compliant with taking her insulin, she would still become disoriented, and there would be concern about her taking any of her medications. *1281 Further, the psychiatrist testified that, as her blood sugar levels rise, appellant would be "less and less able to think clearly enough to manage her illness"; even if the levels are not so high as to cause confusion, "that's associated with intermediate and long-term problems like vascular disease and losing toes, kidney disease," and appellant already has "mild moderate kidney disease probably related to her diabetes." Although the psychiatrist testified that it is hard to predict within what period the failure to take insulin would become life threatening, he did not believe that appellant could handle her medical problems without supervision.
The psychiatrist also testified that appellant's potassium level was high possibly because of a diuretic medication, and that appellant is also at risk for having high levels because of her renal disease. Other doctors at the hospital started appellant on a new medication on the day of the hearing to correct the potassium level, but it was still high, although not dangerously high. The psychiatrist testified that a high potassium level can be immediately life threatening and that the new medication was one that appellant did not want to take because she believed it would cause severe constipation. The psychiatrist testified that, if appellant did not take the medication, "then we'll have trouble getting her potassium down into a safe range." If appellant left the hospital on the day of the hearing without addressing the high potassium level, the condition "would be serious and over the course of three or four days, it could become life threatening."
The social worker testified that, over the last two months of appellant's stay at the hospital, appellant was decompensating in that she was either having more confusion or more difficulty in managing information. Further, appellant had periods when she did not eat lunch, became dizzy during group sessions, and had "an increase in the sort of an inability to manage all parts ofof that kind of basic need." At times appellant had to ask questions of the social worker because "she wasn't able to find her ward."
The social worker testified that she had sent out referrals seeking housing for appellant, but that there were no openings in structured settings and there was no other resource with whom appellant could stay. The psychiatrist testified that appellant's community providers believed that she could be safely managed only in a structured setting, and he believed that appellant's mental illness affected "her ability to stay in various housing situations" and "her ability to care for herself." He testified that, if she is not supervised, she would be kicked out of independent living because she would become disorganized and not compliant "with medicines and her medical condition."
Appellant stated that she has a daughter, but the daughter has been against her since 2005. She also stated that her ex-husband said that she could stay with him for one night if she was released, but that she would then have to try to find a place to stay. She also stated that her ex-husband wanted her to stay where she was. Appellant stated that she guessed she lived on the streets after leaving a housing situation before her commitment in April. Appellant further stated that she was not on the Oregon Health Plan, that she did not know how long it would take to get on the plan, and that, if released, she would have "to get situated with a doctor someplace, but had no doctor."
The examiner, based on the testimony of the psychiatrist and social worker, told appellant, "you haven't done real well previously in even structured group homes and structured environments." He stated that appellant would be in immediate danger from not caring for herself because she would be overwhelmed by trying to find a place to live and caring for herself. He also indicated that appellant's mental disorder was evidenced at the hearing with "paranoid ideation," "pressured speech," and "grandiosity in thinking [appellant] could manage on [her] own." Also, "very consistent with schizoaffective disorder is often a lack of judgment and insight into the things that you need to take care of yourself," which the examiner stated was consistent with appellant's presentation at the hearing.
*1282 The court determined that the witnesses,[2] the psychiatrist and social worker, were credible;[3] that appellant's mental disorder impaired her ability to care for her physical health; and that, if appellant's potassium levels and diabetes were not adequately managed, she was at serious risk of dying.
Appellant argues that, under State v. Bunting, 112 Or.App. 143, 826 P.2d 1060 (1992), the state did not prove by clear and convincing evidence, ORS 426.307(6), that she was "[u]nable to provide for basic personal needs and is not receiving such care as is necessary for health or safety." ORS 426.005(1)(d)(B). The state argues that it did present such evidence under Bunting.[4]
In Bunting, 112 Or.App. at 145-46, 826 P.2d 1060, we stated:
"The legislature's `basic needs' commitment standard focuses on the capacity of the individual to survive, either through his own resources or with help of family or friends. The state must establish by clear and convincing evidence that the individual, due to a mental disorder, is unable to obtain some commodity (e.g., food and water) or service (e.g., life-saving medical care) without which he cannot sustain life. The statute does not express a standard by which the imminence of the threat to life is to be measured.
"A speculative threat, such as failure to take medicine under the circumstances in State v. Brungard, is not by itself sufficient. However, the state need not postpone action until the individual is on the brink of death. The goal of the commitment statute is safe survival, not merely the avoidance of immediate death.
"State v. Brungard, [101 Or.App. 67, 73, 789 P.2d 683 (1990),] construed another commitment statute, ORS 426.005(2)(c), to incorporate the phrase `in the near future' as the measure of the imminence of the statutory condition authorizing commitment. We construe ORS 426.005(2)(b) to incorporate that standard, too. A person is subject to a `basic needs' commitment under ORS 426.005(2)(b) if clear and convincing evidence demonstrates that, due to a mental disorder, there is a likelihood that the person probably would not survive in the near future because the person is unable to provide for basic personal needs and is not receiving care necessary for health or safety."[5]
(Footnote omitted.)
Oregon appellate courts have decided at least four mental commitment cases in which the allegedly mentally ill person had schizoaffective disorder or schizophrenia[6] and *1283 diabetes. See, e.g., State v. M.L.F., 220 Or. App. 629, 188 P.3d 368 (2008); State v. T.L.H., 202 Or.App. 63, 121 P.3d 17 (2005); State v. H.N., 180 Or.App. 541, 43 P.3d 1218 (2002); State v. Ayala, 164 Or.App. 399, 991 P.2d 1100 (1999). The court reversed the commitment of the allegedly mentally ill persons in each of those cases. In Ayala, H.N., and T.L.H., the court did so because the state failed to show that the diabetic condition was severe enough to be life threatening in the near future.[7] In M.L.F., the court merely noted that the allegedly mentally ill person had non-insulin-dependent diabetes while discussing her refusal to take Coumadin, which the court noted was not shown to create a condition that would be life threatening in the near future. 220 Or.App. at 635-36, 188 P.3d 368.
"Case matching is not particularly helpful in these kinds of cases; each case must be decided on its own facts." State v. M.J., 174 Or.App. 74, 82, 23 P.3d 990 (2001). However, unlike the other cases involving diabetes, the evidence in this case clearly shows that appellant is an insulin-dependent diabetic whose lack of management of her diabetes is life threatening. Furthermore, the failure to properly manage medication for her potassium level is also life threatening. It is clear that appellant needs both the insulin and potassium medications in the proper dosage in order to survive. The evidence shows that, because of her mental disorder, without supervision, it is likely that appellant will not be able to obtain the medications, will not administer them properly even if she obtains them, or will be too confused to do either. The evidence is clear and convincing that, if appellant does not receive her medications, either because of confusion or refusal to take them, or administers them incorrectly, she likely will become more confused and place herself in a life threatening condition within a matter of days. In light of this, we conclude that appellant is unable to meet her basic personal needs.
Although appellant stated that her ex-husband told her that she could stay at his place for one night, we do not consider that sufficient assistance for appellant to meet her basic needs. We are not required to accept appellant's statements as to her plans. See State v. M.C., 190 Or.App. 202, 213, 78 P.3d 125 (2003); State v. Doe, 116 Or.App. 18, 21, 840 P.2d 727 (1992). We do not do so here because having a place to stay for one night does not demonstrate one's ability to meet one's basic needs, and the social worker knew of no other resource for appellant.
The dissent, in the last paragraph before its conclusion that "the state did not prove its case by clear and convincing evidence," 230 Or.App. at 1286 (Sercombe, J., dissenting), states, "[f]inally, there was insufficient evidence of appellant's current mental health presented in this record." 230 Or.App. at 1286 (Sercombe, J., dissenting). Not only does this ignore the testimony of the psychiatrist and social worker and the opinion of the examiner about appellant's mental health, the statement raises and then briefly discusses an issue that was not mentioned at the hearing and was not discussed by the parties on appeal. In its brief discussion, the dissent states that "[t]he current mental health of an alleged mentally ill person is obviously relevant to determining whether that person can provide for basic needs," 230 Or.App. at 1286 (Sercombe, J., dissenting), a proposition with which we do not disagree, and cites ORS 426.307(6), which states, in part,
"[t]he court shall determine whether the person is still a mentally ill person and in need of further treatment. If in the opinion of the court the individual is still a mentally ill person by clear and convincing evidence and in need of further treatment, the court may order [commitment] for an additional * * * period of time up to 180 days."
The dissent, without citation, then concludes that this statute requires the state "to show the effectiveness or not of current treatment in order to assess the `need for further treatment.'" *1284 230 Or.App. at 1286 (Sercombe, J., dissenting).
This is not the only plausible reading of the statute. More importantly, the trial court had no inkling that it would possibly be an issue. Appellant's argument is, basically, that she has a plan and that it has not been shown that she will be unable to survive in the near future. If the court or the parties had known that "the effectiveness or not of current treatment" and "`the need for further treatment'" would be an issue, it could have been addressed. For example, while the examiner was stating his opinions, the court asked him, "Can you talk about the [mental] disorder you determined?" The court or the parties could just as easily have asked the treating psychiatrist, "Can you talk about `the effectiveness or not of current treatment' and the `need for further treatment?'" The answer to the question is in the evidence. Appellant has had schizophrenia for many years. She came into the hospital in April 2007 because she was too agitated to be maintained in the structured setting that she was in at the time. She was deteriorating over the last two months of her current stay and was so confused that at times she could not find her ward, forgot to eat, and had an increased inability to manage her basic needs. Further, her mental condition has prevented her from staying in less structured settings over the two-year period before the hearing and at the time of the hearing, and prevented her from managing her medical conditions without supervision. It was her psychiatrist's opinion that appellant did not recognize the need for supervision and that appellant's mental condition affected her ability to care for herself. The state does not have "to postpone action until the individual is on the brink of death." Bunting, 112 Or.App. at 145, 826 P.2d 1060.
Finally, the dissent states that, rather than address "the need for further treatment," the treating psychiatrist, the social worker, and the examiner discussed appellant's existing medical condition and the desirability of finding structured housing for appellant. This does not mean appellant is not a mentally ill person under ORS 426.005(1)(d)(B). It simply means, as stated above, that appellant's existing medical conditions are life threatening and she cannot manage her basic needs without being in a supervised, structured setting.
We therefore agree with the trial court's determination that appellant was "unable to provide for basic personal needs" and, if released, would not receive such care as is necessary for health and safety.
Affirmed.
SERCOMBE, J., dissenting.
In order to continue appellant's commitment, ORS 426.307(6) requires the court to find that appellant "is still a mentally ill person by clear and convincing evidence and in need of further treatment." ORS 426.005(1)(d) defines "mentally ill person" as a "person who, because of a mental disorder" is "dangerous to self or others" or "unable to provide for basic personal needs and is not receiving such care as is necessary for health or safety." I dissent because the record does not contain clear and convincing evidence that appellant's mental disorder causes her to be unable to provide for her basic personal needs.
The state's burden of proof in mental commitment proceedings is quite exacting. We have explained that standard as follows:
"We emphasize, at the outset, that the standard of proof is `clear and convincing' evidence. * * * To be `clear and convincing,' evidence must be of `extraordinary persuasiveness.' State v. Howell, 53 Or. App. 611, 617, 633 P.2d 14 (1981); see also State v. M.J., 174 Or.App. 74, 77-78, 23 P.3d 990, rev. den., 332 Or. 316, 28 P.3d 1176 (2001) (describing `clear and convincing' evidence as evidence establishing that `the truth of the facts asserted is highly probable').
"We begin with the `basic needs' criterion. `Basic needs are those things necessary to sustain life.' State v. Brungard, 101 Or.App. 67, 71, 789 P.2d 683, modified on recons., 102 Or.App. 509, 794 P.2d 1257 (1990), rev. den., 311 Or. 427, 812 P.2d 827 (1991). Because `[t]he goal of the commitment statute is safe survival, not merely *1285 the avoidance of immediate death,' the state, in invoking the `basic needs' criterion, `need not postpone action until the individual is on the brink of death.' State v. Bunting, 112 Or.App. 143, 145, 826 P.2d 1060 (1992). Nevertheless, the state must show that appellant `probably would not survive in the near future because [she] is unable to provide for basic personal needs and is not receiving care necessary for health or safety.' Id. at 146, 826 P.2d 1060 (emphasis added)."
State v. T.L.H., 202 Or.App. 63, 66-67, 121 P.3d 17 (2005).
There was insufficient clear and convincing evidence in this case that appellant's mental disorder would cause her to not take or to mismanage her medication in such a way as to become life threatening in the near future. Dr. Hansen, the only medical expert witness,[1] testified on the basis of a review of appellant's records and a 25-minute interview of her. Hansen testified about appellant's future consumption of insulin for her diabetes and Kayexalate for an excess of potassium in her blood.
With respect to insulin ingestion, Hansen stated that he "can't predict in the future whether she would stop her insulin." Appellant's failure to take insulin "could be" life-threatening, but "[t]hat kind of prediction is an extremely hard one to make." Instead, Hansen was concerned that appellant would take the wrong amount of insulin at times. He testified that, if the blood sugar level is "too low[,] then it causes confusion and a person can even pass out and have brain injury from that. And if it goes too high, if it's very much too high, and would usually require her taking too little for quite a few days, then a person can become very confused from that." The wrong blood-sugar level is associated with "intermediate and long-term medical problems like vascular disease and losing toes, kidney disease."
Hansen's testimony is not clear and convincing evidence of imminent and significant physical harm. There was no evidence that appellant's condition would cause her to stop taking insulin. Hansen testified that that prediction was speculative. Appellant testified that she intended to take her insulin. She stated that she needed assistance at times in reading the proper dosage on the syringe for her morning shot, but not for the three other daily treatments. Even if appellant's mental disorder caused her to improperly dose herself, that mismanagement would result in "confusion" and, over time, "intermediate and long-term medical problems." There was no evidence, much less clear and convincing evidence, that appellant's administration of insulin would cause her imminent and significant harm.
Hansen also opined that it was important for appellant to continue treatment in the short term for a high potassium level in her blood. The potassium level had spiked "probably because of an adjustment in a diuretic medication three weeks or so ago." Hansen said that the potassium level was "not highly unsafe now, but if it continued to go up it could become unsafe." The administration of Kayexalate had been recently started and was required to be continued for a few more days. Hansen stated that appellant could be given a set dose to take, and then she could check with her doctor the following week. Hansen opined that "it could become life threatening" if the medication was discontinued. There was no evidence, however, that appellant would not take the medication during the next few days and before any potential disorganization or confusion caused by improper dosing of insulin occurred. Hansen noted that she had not refused the medication. Appellant testified that she would take the drugs. Thus, the only evidence of significant and imminent harm to appellant was Hansen's speculation *1286 that she might discontinue taking a medication for an acute health condition at some point in the future. Again, that is not clear and convincing evidence of failure to meet basic needs.
The majority recognizes that we have regularly reversed mental commitments based on speculation that the alleged mentally ill person will not continue needed medication or because the risk of harm from insufficient medication was not sufficiently explained. See State v. A.L.W., 226 Or.App. 445, 204 P.3d 103 (2009); State v. M.L.F., 220 Or.App. 629, 188 P.3d 368 (2008); State v. M.A.B., 212 Or.App. 400, 157 P.3d 1256 (2007); State v. T.L.H., 202 Or.App. 63, 121 P.3d 17 (2005); State v. H.N., 180 Or.App. 541, 43 P.3d 1218 (2002); State v. Ayala, 164 Or.App. 399, 991 P.2d 1100 (1999). In my view, this case suffers the same deficiencies of proof. The future adequacy of appellant's self-medication is uncertain; the risks of harm from undertreated diabetes in this case are not clear; and the chronic nature of appellant's potassium elevation was not explained.
Finally, there was insufficient evidence of appellant's current mental health presented in this record. A social worker, who was not appellant's regular care provider, testified that appellant had been experiencing "some increasing amount of confusion or difficulty managing information * * * even that she's had periods when she might not have eaten lunch." But there was a paucity of proof on whether appellant's schizoaffective disorder had been ameliorated by four months of treatment. In a recommitment proceeding, the question presented is "whether the person is still a mentally ill person and in need of further treatment." ORS 426.307(6). It is necessary to show the effectiveness or not of current treatment in order to assess the "need for further treatment." The current mental health of an alleged mentally ill person is obviously relevant to determining whether that person can provide for basic personal needs. Hansen, who was not appellant's regular physician, did not address the "need for further treatment," or appellant's existing medical condition, other than the need to continue appellant's medication.[2]
Because the state did not prove its case by clear and convincing evidence, I respectfully dissent.
NOTES
[*] Barron, J. pro tempore, vice Wollheim, J.
[1] ORS 19.415 was recently amended by Senate Bill 262 (2009) to govern our standard of review in equitable cases such as this one. The amendments apply to appeals in which the notice of appeal was filed on or after June 4, 2009. Because the notice of appeal in this case was filed before that date, the amendments do not apply.
[2] It is clear from reading the court's remarks that it made a distinction between appellant and the witnesses. Further, appellant was not under oath or affirmation during her examination. ORS 40.320 requires that, "[b]efore testifying, every witness shall be required to declare that the witness will testify truthfully, by oath or affirmation* * *." This does not mean, however, that the court is unable to consider what appellant said because, whether the failure to administer an oath to appellant was intentional or inadvertent, neither the state nor appellant objected. See State v. Doud, 190 Or. 218, 232-41, 225 P.2d 400 (1950) (failure to object to a witness not being given an oath before testifying is a waiver).
[3] Although we review recommitment proceedings de novo, we give deference to the trial court's assessment of the credibility of witnesses, State v. M.D.W., 181 Or.App. 229, 239, 45 P.3d 1046 (2002), and some deference to the trial court's conclusion as to the mental state of the alleged mentally ill person based on its opportunity to view the demeanor of the person. State v. Smith, 71 Or.App. 205, 212 n. 8, 692 P.2d 120 (1984).
[4] The state also contends that Bunting adopted a standard for determining whether a person is "unable to provide for basic personal needs and is not receiving such care as necessary for health or safety" that is more restrictive than the legislature intended, as the legislative intent was identified in O'Neill, 274 Or. 59, 545 P.2d 97, and State v. Alexander, 26 Or.App. 943, 554 P.2d 524 (1976). Because we agree that the state presented clear and convincing evidence that appellant is a mentally ill person under the Bunting standard, we need not address this contention, which was not raised by the state at the hearing.
[5] "A person's ability to care for herself is assessed in the light of existing, as opposed to future or potential, conditions." State v. Headings, 140 Or.App. 421, 426, 914 P.2d 1129 (1996) (citing State v. Stanley, 117 Or.App. 327, 330, 843 P.2d 1018 (1992)).
[6] According to the psychiatrist who testified in the present case, schizoaffective disorder and schizophrenia have the same manifestations and, recently, appellant was thought to have schizophrenia.
[7] The alleged mentally ill persons in Ayala and H.N. were non-insulin-dependent diabetics. There was evidence in T.L.H. that the alleged mentally ill person had to take medication for her diabetes, but the evidence did not indicate what type of medication.
[1] Hansen was the only medical witness for the state. The examiner testified on the basis of his observations of appellant during the trial and Hansen's testimony and not on the basis of any independent medical evaluation. In my judgment, the evaluation of the examiner was simply not credible. The examiner testified that appellant's testimony at the trial showed "paranoid ideation" and "grandiosity in believing she could manage on her own." In truth, appellant's testimony about her plans to enroll in the Oregon Health Plan, obtain some medical services through Cascadia, use funds in an existing bank account, and rent a studio apartment was fairly straightforward and plainly stated.
[2] Instead, both of the state's witnesses and the examiner reported on the desirability of finding structured housing for appellant, rather than the rental of a studio apartment. The immediate lack of that preferred housing is an insufficient basis for recommitment. State v. M.C., 227 Or. App. 530, 206 P.3d 1096 (2009) (lack of housing plans insufficient to prove that "an imminent threat to safe survival exists" in commitment case).